54 N.J. Super. 442 (1959)
149 A.2d 271
ERNEST M. KRAUTH, PLAINTIFF-RESPONDENT,
v.
ISRAEL GELLER, DEFENDANT-APPELLANT, AND BUCKINGHAM HOMES, INC., A CORPORATION OF THE STATE OF NEW JERSEY, ALSO KNOWN AS BUCKINGHAM BUILDERS, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued December 8, 1958.
Decided March 9, 1959.
*446 Before Judges PRICE, SCHETTINO and HALL.
Mr. Edward E. Kuebler argued the cause for defendant-appellant.
Mr. Harold E. Teltser argued the cause for plaintiff-respondent (Messrs. Torppey and Teltser, attorneys; Mr. Teltser, of counsel).
The opinion of the court was delivered by HALL, J.A.D.
In this action plaintiff, a salaried officer of the West Orange Fire Department, sued for personal injuries sustained by reason of a fall on appellant's premises during the course of responding to an alarm for a fire therein. The appeal is from a judgment in plaintiff's favor entered in the Law Division on a jury verdict. A subsequent motion for a new trial was denied. The claim against the corporate defendant was dismissed by the trial court and we are not concerned with it here. The principal grounds urged for reversal are denial of appellant's motions for involuntary dismissal at the end of plaintiff's case and for judgment at the conclusion of the entire case, and alleged errors in the charge to the jury. Pervading the whole case is the legal question of the duty owed, in the instant circumstances, by a land occupier to a fireman on the premises to extinguish a fire.
*447 The complaint charged in the first count that appellant, as the owner and general contractor of a house in the course of construction at the time of the occurrence, "carelessly, negligently, wantonly and willfully" failed to maintain proper and reasonably safe conditions upon the premises in connection with a stairwell, and otherwise and similarly, and "unlawfully" as well, "placed or caused to be placed within said house a salamander or firepot, which caused considerable smoke to escape from it, thereby filling the house," and that such conduct "caused a dangerous condition to exist in the house," by reason of which plaintiff fell and injured himself while in the house in the line of duty. The second count, on the same factual allegations, asserted that because of "the dangerous and defective conditions which existed" appellant "created a nuisance," as a result of which plaintiff fell and sustained injury. The answer was a general denial and also pleaded the affirmative defenses of contributory negligence and assumption of risk.
Plaintiff's factual contentions, as set forth in the pretrial order, were that appellant created and maintained a dangerous condition on the premises, one, by permitting a salamander to burn in the house with escaping smoke and without maintaining control of it or providing a watchman and in violation of the town ordinance and state statute (of which violations, incidentally, there was no proof at the trial), and, two, by lack of proper safeguards about a balcony and stairwell during construction and in failing properly to construct the premises (of which failure there was also no proof) and to inform plaintiff of the dangers, all of which it was claimed created and set in motion a dangerous and hazardous situation with foreseeable risk of accident.
The pretrial order did not make clear just what legal duty plaintiff claimed he was owed. It did not specify whether he conceived liability could be imposed simply on the basis of so-called ordinary negligence or if willful or wanton conduct was required. Both bases were mentioned in the order (as well as the nuisance theory). This uncertainty *448 was carried into the charge. Both (together with the concept of nuisance) were put to the jury in a confusing manner without adequate explanation. For example, at one point in the charge, the judge said this:
"A member of a public fire department who, in an emergency, enters on premises in the discharge of his duties is a mere licensee under a commission to enter, given by law, to whom the owner or occupant is under no duty except to refrain from injuring him willfully or wantonly and to exercise ordinary care to avoid imperiling him by active conduct."
But he then went on immediately to state:
"Further, if the owner or occupant of land knows of some artificial or natural condition on the premises and in the exercise of reasonable foresight he realizes that it involves an unreasonable risk to a licensee, the owner or occupant has the duty to take responsible [sic] care to make the condition safe or to give a warning of its presence and of the extent of the risk involved."
Since a principal question on this appeal is the propriety of the denial of appellant's motions, we shall set forth the facts in the light most favorable to plaintiff under the familiar rule that the evidence must be so considered on such motions. Practically all of the evidence on the issue of liability came in on plaintiff's case, and, except in small particulars, his proofs were not challenged or added to by appellant's witnesses.
About 8 P.M. on March 5, 1955 plaintiff and three other firemen responded to a fire call at premises owned by appellant at 10 Lancaster Terrace, West Orange, which had been turned in by a neighbor. They discovered a salamander (admittedly owned by appellant) flaming out of its stack in the basement of the premises, which was a front-to-back split-level home then under construction by appellant. A salamander is a self-contained stove burning oil and not connected with an outside chimney. It is used to heat homes during construction and, as here, to dry out plaster. If the air intake remains properly set, it burns without flame or smoke coming out of its stack. The device was extinguished *449 but considerable smoke had filled the house and it was necessary to open the temporary windows to allow the house to air out. It was dark inside and the firemen found it necessary to use portable lights to find their way around. While there was no evidence in the basement that the flame had communicated fire to the building itself, to make certain the firemen went to the bedroom level and checked the walls, ceilings and floors there. Upon completing this inspection the plaintiff and another fireman, one McChesney, left one of the bedrooms and proceeded to return to the living room level. McChesney was using a portable light by reason of the smoke and its beam was directed past plaintiff's right leg. When plaintiff left the bedroom he walked straight ahead, thinking he was going down the stairs, but by reason of the smoke obstructing his vision, he stepped off a balcony, the railing for which had not yet been erected, and fell into a stairwell leading from the living room level to the basement, thereby sustaining the injuries for which he brought suit.
On March 1, 1958 plaintiff's fire company had been called to the premises to extinguish an over-heated salamander. Again on March 2 the fire company was called for the same purpose. Plaintiff was in the group which responded on the 1st but was not present on the 2nd. Both alarms were sent in by neighbors who had seen the stack glowing red in the darkness and believed there was an actual fire. There was some question as to whether there was any real need for the fire company to be called on these occasions, but that is of no moment.
Between the fire call on March 1 and that on March 5, appellant was admonished by the assistant chief of the fire department with respect to the use of the salamander. The assistant chief testified that he told appellant not to use the salamander unless a man was left in attendance or appellant personally checked it. The latter denied that he had been instructed that an attendant was necessary (this was the only real contradiction in the evidence) and testified that the assistant chief advised him to place a piece of *450 tin or sheet rock on the top of the stack and that he had communicated this request to his plasterer-subcontractor working on the premises and to whom he had loaned the device and who was the one actually using it. He said he had checked and found this had been done. (In our determination of this appeal we do not consider this testimony of defendant since plaintiff is entitled to the most favorable consideration of the evidence.) It may be pointed out that the reason for the admonition about its future use was not because it might endanger firemen or any one else, or even cause property damage, but rather to avoid the annoyance and trouble of unnecessary visits by the firemen. The assistant chief testified he told appellant that "we would not expect to answer a fire call again."
Plaintiff admitted that he knew the premises were under construction and that there was no railing around the balcony from which he fell. He knew this from answering the fire call on March 1 and his further observation of the condition when answering the alarm on March 5.
We proceed to a consideration of the various reasons advanced by appellant in support of his position that the trial court erroneously denied his motions for judgment.
One of the grounds of the motion made at the conclusion of the case was that appellant was under no liability because, as we have just said, he lent the salamander to his plasterer, claimed to be an independent contractor, who was actually using it and over whom he exercised no direction or control. The plasterer was not called as a witness. Appellant said he could not locate him. The contention and issue do not appear in the pleadings or pretrial order as such, but appear to have been fully tried without objection (R.R. 4:15-2). The question was left to the jury. There was no objection to this portion of the charge. The failure to grant the motion on this ground is urged here as reversible error. In view of our basis of decision, we need not pass on it.
Appellant moved for dismissal of the second (nuisance) count of the complaint at the end of plaintiff's *451 case, and reasserted the contention at the end of the entire case, on the basis, in effect, that there was no proof of the creation or maintenance of a nuisance in the true legal sense. The question of whether appellant's acts or omissions amounted to such was left to the jury in a theoretical dissertation on the subject of a true nuisance at law, with the further instruction that contributory negligence is "not a defense to the intentional invasion of the plaintiff's interests involved in nuisance cases, but it may be a defense where the basis of the nuisance is merely negligent conduct of the defendant." Nowhere did the court say that the nuisance here, if there were one, arose out of mere negligent conduct, nor did it leave that question for jury determination. Appellant objected to the charge on the ground that the facts did not establish a nuisance of an actionable character, i.e., that a nuisance in the true legal sense had not been established in the case and that the concept had no proper place in it. He makes essentially the same argument to us. We agree with his contention. The second count should have been dismissed on the motion. The submission of the question to the jury, as an alternative theory of recovery, when it should have been earlier ruled out of the case completely, constituted prejudicial and reversible error, especially in view of the charge on the question of contributory negligence.
It has been well said by a learned text writer:
"There is perhaps no more impenetrable jungle in the entire law than that which surrounds the word `nuisance.' It has meant all things to all men, and has been applied indiscriminately to everything from an alarming advertisement to a cockroach baked in a pie. There is general agreement that it is incapable of any exact or comprehensive definition. Few terms have afforded so excellent an illustration of the familiar tendency of the courts to seize upon a catchword as a substitute for any analysis of a problem; the defendant's interference with the plaintiff's interests is characterized as a `nuisance,' and there is nothing more to be said." Prosser, Torts (2d ed. 1955), p. 389.
There has been an increasing tendency in recent years in this State, especially in cases involving injury or damage *452 from conditions or activities on real property to sue, at least alternatively, on the theory of nuisance, regardless of whether careful analysis of the facts would warrant the application of the concept in its proper sense.
Private nuisances, in the tort aspect, are considered to be of two kinds, an absolute nuisance or nuisance per se (which we referred to above as a "true nuisance") and those founded upon negligence, so-called. The former has been defined as "an act, occupation or structure which is a nuisance at all times and under all circumstances, regardless of location or surroundings." Priory v. Borough of Manasquan, 39 N.J. Super. 147, 157 (App. Div. 1956). The most essential characteristic is perhaps that the creation of the condition or the doing of the act is intentional, that word being used in a precise and not a broad sense. As Dean Prosser puts it:
"Occasionally they [nuisances] proceed from a malicious desire to do harm for its own sake [e.g., the spite fence cases]; but more often they are intentional merely in the sense that the defendant has created or continued the condition causing the nuisance with full knowledge that the harm to the plaintiff's interests is substantially certain to follow. Thus a defendant who continues to spray chemicals into the air after he is notified that they are blown onto the plaintiff's land is to be regarded as intending that result. If there is no reasonable justification for such conduct, it is tortious and subjects him to liability." Ibid, p. 392 (emphasis supplied).
The same authority summarizes the nuisance founded on negligence in this language:
"But a nuisance may also result from conduct which is merely negligent, where there is no intent to interfere in any way with the plaintiff, but merely a failure to take precautions against a risk apparent to a reasonable man." Ibid, p. 392 (emphasis supplied).
The distinction was clearly recognized and discussed in Hartman v. City of Brigantine, 23 N.J. 530 (1957) where the court pointed out the impropriety of applying the nuisance label to the second situation. Justice Jacobs there said:
*453 "That the plaintiff has called the active wrongdoing a nuisance should not enter into the matter. If there were no negligent acts of commission [or for that matter, of omission] there is no responsibility to the plaintiff. If, however, there were such acts and they caused the injury and death, then the question arises as to whether the decedent himself exercised due care in the light of the circumstances; if he did not and his negligence proximately contributed to the injury and death, then the plaintiff is not entitled to recover." (23 N.J., at page 536.)
The danger of being loose or inexact in using of the label is pointed up in the quotation. Contributory negligence, as such, is not a defense in the case of an absolute nuisance (and it was so charged in the instant case), although a plaintiff may be defeated when, with knowledge of the danger, he voluntarily assumed it. Hammond v. County of Monmouth, 117 N.J.L. 11, 16-17 (Sup. Ct. 1936). It is available where the so-called nuisance is founded on negligence, as in any negligence case.
There is nothing in the facts at bar, or in so many of the cases in our courts where the concept has been pleaded, to demonstrate the existence of an absolute nuisance. Certainly such did not arise because the balcony railing had not been installed; a house cannot all be constructed in the same moment. Failure to attend the salamander or carelessness in its operation could amount, at best, to nothing more than an ordinary negligent act of omission or commission.
The question of the legal duty owed to plaintiff arises under appellant's contention that the motions for judgment should have been granted because plaintiff had failed to prove any act of negligence. There can, of course, be no actionable negligence if the actor violated no duty he owed to the injured party. Consideration of the question must be had with close regard for the facts.
We have here an injury to a fireman while he was engaged in the work for which he was hired  the extinguishment of fires. For the purpose of motions for judgment, it must be inferred that his fall resulted from the smoke, coming from the fire, which prevented him from seeing that he was *454 not about to walk down the stairs but was going to step off the unguarded balcony. While the fall would not have occurred if the contemplated railing had then been in place, we fail to see how that is of any real import. This was a house under construction, a fact obvious to anyone, and, as we have said, every part of it could not be built at one time. Speaking generally, it seems ridiculous to say that a builder must construct a building in such a way, even if physically possible, that at no time is there any condition present which might be considered hazardous to an adult coming on the premises. It appears equally lacking in common sense to suggest that some warning of conditions bound to exist in the ordinary course of building should have to be posted or otherwise given by the owner or contractor for the benefit of visitors, especially unexpected ones such as firemen who arrive in emergencies and may have to come at any hour, light or dark, and at times when no one connected with the enterprise may be expected to be present. Practically speaking, it is difficult to envisage how any effective warning could be given. Moreover, here the plaintiff knew that the balcony was unguarded (which we speak of in relation to the occupier's duty and not in the connotation of an affirmative defense of assumption of risk or contributory negligence. Cf. Pearlstein v. Leeds, 52 N.J. Super. 450, 456 (App. Div. 1958), certification denied, 29 N.J. 354 (1959)).
Nor can it be suggested with any degree of reason that a salamander in operation is intrinsically a dangerous instrumentality in the sense that term is used in our law. It is really no different from any other kind of heating apparatus, any of which, including the ordinary home oil burner, can belch flame and smoke if not functioning properly. We conceive this case is not legally different in essentials from one where an oil burner in an occupied home catches fire because the owner carelessly neglected to have it cleaned, emits flame and spreads thick smoke throughout the house, and a fireman, not familiar with the premises, falls down the stairs because he fails to see them due to the smoke. *455 The law seems clear that there would be no liability in such instance for an occupier is not liable to a fireman merely because the fire  the beginning point in the chain of circumstances leading to injury  was caused by his negligence. 2 Harper and James, The Law of Torts (1956), p. 1503. If the contrary were so a person would act at his peril every time he turned in an alarm. Fire departments are publicly maintained and firemen enter into their hazardous occupation to fight all fires, no matter how caused.
We should also consider the unusual circumstance in the instant case that this salamander had not functioned properly on two previous occasions and appellant had been warned about the exercise of precautions in its use. Assuming for present purposes that there was previous actual malfunction due to careless operation and that failure to take sufficient additional precautions thereafter resulted in the third alarm, we fail to see any essential difference in principle. Fundamentally, negligent conduct in the present connotation has to be found in "an act which the actor as a reasonable man should realize as involving an unreasonable risk of causing an invasion of an interest of another." Restatement, Torts, sec. 284 (a). The realization of risk involves the element of reasonable foreseeability "that the act creates an appreciable chance of causing such invasion." Ibid., sec. 289. It seems to us unsound to say that appellant should be held to foresee that lack of appropriate precautions in operating the salamander, even after the prior incidents, involved an appreciable chance of injury to one in the situation of plaintiff, especially when the precautions had been suggested to avoid the annoyance of unnecessary responses by the fire department.
We are of the opinion that the matter of the duty owed should be determined on the broad basis that liability is not imposed on a land occupier in favor of a fireman where the injuries arise from a usual hazard which is the only reason for his being on the premises and which it is the very nature of his calling to encounter and assume, absent some special factor which we have indicated does *456 not exist here. See Prosser, ibid., pp. 460-462; 2 Harper and James, ibid., p. 1501 et seq.; 65 C.J.S. Negligence § 35, p. 494; 38 Am. Jur., Negligence, § 125, p. 785.
Looking at the precise question from the standpoint of authority, we find that New Jersey has never expressly decided it. Cf. Kelly v. Henry Muhs Co., 71 N.J.L. 358 (Sup. Ct. 1904); Barnett v. Atlantic City Electric Co., 87 N.J.L. 29 (Sup. Ct. 1915); Campbell v. Pure Oil Co., 15 N.J. Misc. 723 (Sup. Ct. 1937). Cases in other jurisdictions are collected in annotations in 13 A.L.R. 637, 141 A.L.R. 584 and 55 A.L.R.2d 525.
From the point of view of liability of the land occupier, the fireman does not completely fit any recognized status classification and the nature and extent of the duty specified as flowing therefrom. He is in large measure sui generis. He is not a trespasser because he enters the land under license of law and a privilege. Cf. Restatement, Torts, secs. 196, 211. He is not strictly an invitee, for he may come on without any express consent or invitation of the owner. Since he may enter without the occupier's invitation or permission, it is frequently said that he is a "bare" licensee. Cf. Restatement, Torts, secs. 330, 331. See Barnett v. Atlantic City Electric Co., supra; cf. Campbell v. Pure Oil Co., supra. But see Meiers v. Fred Koch Brewery, 229 N.Y. 10, 127 N.E. 491, 13 A.L.R. 633 (Ct. App. 1920).
The conditions of liability and duties imposed by the Restatement (secs. 341, 342, 345) with respect to activities and "dangerous" conditions affecting licensees and persons privileged to enter for a public or private purpose, are hardly appropriate in all respects to the instant factual situation. We have already discussed the impracticality of giving a warning, and there is similar difficulty in making the condition (here we refer to the fact that the balcony rail had not yet been installed) reasonably safe. It might be suggested that the principles laid down in the cited Restatement sections are authority for barring recovery as a matter of law here because the risk cannot be said in any *457 event to be unreasonable to a fireman and plaintiff admitted personal knowledge of the absence of the railing. Cf. Pearlstein v. Leeds, supra (52 N.J. Super., at page 456). And we do not conceive this absence to amount to a "dangerous condition" within the meaning of the Restatement in the instant factual setting.
There is authority that the only duty owed by the occupier to a fireman entering the premises to abate a fire is "to abstain from acts willfully and wantonly injurious to [him]." See Campbell v. The Pure Oil Co., supra (15 N.J. Misc., at page 725) and cases there cited; 13 A.L.R. 638. If that be the test, there was nothing willful or wanton about what appellant did or failed to do here as far as plaintiff was concerned. Staub v. Public Service Railway Co., 97 N.J.L. 297, 300 (E. & A. 1922). That rule appears to have been derived, perhaps in an effort to prescribe a certain test, from the old view of the limited extent of duty owed to an ordinary licensee (e.g., Lordi v. Spiotta, 133 N.J.L. 581 (Sup. Ct. 1946)) which has been considerably enlarged in this State in recent years to attain the view of the Restatement. Pearlstein v. Leeds, supra, and cases therein cited. While we feel satisfied that a fireman, injured while fighting the blaze, would certainly be entitled to recover today if his injuries resulted from willful and wanton acts, we think that, under modern concepts of tort liability, he should be entitled to a cause of action also if his injuries result from serious hidden traps and unusually dangerous instrumentalities or substances not likely to be known about or recognized and of which warning could practically be given or the danger reasonably guarded against in advance. See, e.g., Schwab v. Rubel Corporation, 286 N.Y. 525, 37 N.E.2d 234 (Ct. App. 1941). (None of these factors is present here.) We do not, however, as we have indicated, perceive the soundness of applying in full the present Restatement rules with respect to licensees.
Moreover, it also seems clear that a fireman may recover from a land possessor in certain other situations, not necessarily because he is a fireman, but where a person *458 not serving in that capacity but rightfully present at the spot of injury could recover in a like situation, as for example where a fireman fell into an open coal hole in an unlighted driveway on the defendant's premises while walking thereon to reach a fire on the property (Meiers v. Fred Koch Brewery, supra; note also Restatement, Torts, sec. 345, p. 948, illustration 1) or where dangerous substances had been negligently allowed to accumulate and there was an absence of fire protective devices required by an ordinance and the fireman was injured off the property. (Campbell v. Pure Oil Co., supra). In such situations the fact that the plaintiff is a fireman is of relatively little concern.
A most appropriate statement of our view of the law that should govern the sufficiency of a fireman's claim for injuries sustained while fighting a fire is found in the dictum of Judge Jayne (sitting at the circuit) in the Campbell case:
"It cannot in reason be stated that a fireman has no protective rights whatever while engaged in the pursuit of his employment. It is contemplated that a fireman in the performance of his duty shall endeavor to extinguish fires however caused and encounter those risks and hazards which are ordinarily incidental to such an undertaking and which may be reasonably expected to exist in the situation in which he places himself. It does not follow that a fireman must be deemed as a matter of law to have voluntarily assumed all hidden, unknown, and extrahazardous dangers which in the existing conditions would not be reasonably anticipated or foreseen." (15 N.J. Misc., at page 727.)
(We see nothing in Bango v. Carteret Lions Club, 12 N.J. Super. 52 (App. Div. 1951), certification denied 7 N.J. 347 (1951), relied on by plaintiff by way of analogy, which dictates a different point of view.)
Under the instant facts, we conclude that plaintiff did not establish a case of actionable negligence and that appellant's motion for judgment, at least that made at the end of the entire case, should have been granted.
This disposition makes unnecessary discussion of appellant's alternative contention that he was also entitled to judgment because, as matter of law, any negligence of *459 his was not the proximate cause of plaintiff's injuries, or that errors in the charge require reversal, except to note that the former, if there had been any negligence, appears to be a jury question (cf. Glaser v. Hackensack Water Co., 49 N.J. Super. 591 (App. Div. 1958)), and that as to the latter, we feel appellant's points are well taken. There was no proof of any violation of the state statute concerning salamanders (R.S. 34:5-142 to 145, inc.) and so the matter of any negligence arising therefrom should not have been put to the jury. We also are of the opinion that the charging of the three plaintiff's requests objected to was prejudicially erroneous. One of these brought into the case the so-called "danger invites rescue" doctrine, stating that in such a situation, the rescuer cannot be guilty of contributory negligence or assumption of risk. The doctrine is well recognized in New Jersey (Cafone v. Spiniello Construction Co., 42 N.J. Super. 590, 602 (App. Div. 1956)), but has no application to the facts of the case at bar.
The judgment is reversed with the direction that judgment be entered in favor of appellant as if at the end of the entire case.
SCHETTINO, J.A.D. (dissenting).
I disagree with the majority's determination that appellant's motion for judgment of dismissal, "at least that made at the end of the entire case," should have been granted. I feel there should be a reversal and a remand directing a new trial.
I have no disagreement with the majority's conclusions dismissing the nuisance count, and determining that the question of proximate cause would be a matter for the jury and that the charge of the trial court was deficient in certain respects. But I am unable to agree that judgment should have been entered for defendant at the close of the entire case. I would hold that an actionable claim had been made out by plaintiff.
The core of my disagreement with the majority concerns the question of wanton negligence. The majority concedes that "a fireman, injured while fighting the blaze, would *460 certainly be entitled to recover today if his injuries resulted from willful and wanton acts, * * *" Campbell v. Pure Oil Co., 15 N.J. Misc. 723, 725 (Sup. Ct. 1937), not officially reported. However, it decides as a matter of law that there was no wanton negligence involved in this case. With this conclusion I disagree.
In Melone v. Jersey Central Power & Light Co., 18 N.J. 163, 170 (1955), the court said:
"A motion for judgment of dismissal admits the truth of the plaintiff's evidence and every inference of fact that can be legitimately drawn therefrom which is favorable to the plaintiff and denies only its sufficiency in law. And on a motion for judgment the trial court cannot weigh the evidence but must accept as true all evidence which supports the view of the party against whom the motion is made and must give him the benefit of all legitimate inferences which are to be drawn therefrom in his favor. These are settled juridical concepts."
See also, DeRienzo v. Morristown Airport Corporation, 28 N.J. 231, 236 (1958); Honey v. Brown, 22 N.J. 433, 438 (1956). With these controlling principles in mind I set forth the facts and inferences therefrom in a manner most favorable to plaintiff.
On March 5, 1955 plaintiff was injured in appellant's partly built house while in the performance of his duties as a fire department captain. Plaintiff and his fire company had been called to defendant's premises on March 1, 1955 when a salamander was flaming out of control. Plaintiff testified that on that occasion there were actual flames coming out of the salamander, i.e., that "It was flaming," and that there "was quite a bit of smoke; but we ventilated it and it went out very quickly." Assistant Chief Mulvihill testified that an investigation "showed me that the result of the fire was an overheated salamander." Again, on March 2, 1955 a similar incident occurred. Plaintiff was not present on this occasion but a Captain Moore testified that "we found an overheated salamander was the cause of the alarm being sent in," and "There was flames shooting from the top of the salamander and it was almost cherry *461 red with heat. It was very hot" and "The house was filled with smoke."
On March 2, 1955, prior to the call of that day, Mulvihill testified that he spoke to appellant about the salamander. The chief testified that he "asked him [Geller] if he would please leave a man there in attendance with it or if he would check it himself," and "if he was going to use the salamander again that night, that we would not expect to answer a fire call again, and if he was to use it again that he would either please stay there or have a man stay in attendance." Geller denied he was ordered to place some one in attendance while the salamander was in use, but in this procedural situation we must accept Mulvihill's version. See Melone case, supra. Geller did admit that he was told to place a covering over the salamander. He also admitted that he owned the salamander, but claimed that he lent it to the subcontractor to whom, he stated, he passed on Mulvihill's instructions.
Plaintiff and three other firemen responded to a call to appellant's premises on March 5 at about 8 P.M. It was dark at that hour. They found a salamander flaming out of control in the basement room. A salamander is basically a stovepipe welded into a tub with valve openings to allow a mixture of oxygen and fuel "to make proper combustion, and if they are not set properly they will flame." Plaintiff described it as:
"A. As I remember and observed it  I may be wrong  it has a tank in the bottom and it has a fill cap and they have air hose that give it certain amounts of oxygen so it will burn properly and above that then it has a four-foot stack that goes up and a cone cover on top of it  a little above  perhaps four inches more or less, and also a cap that you can throw over so if you shut off the air flow  the damper  and put the cap on top, it will go out.
Q. In other words then, as I gather from your description, this is a sort of an oil-burner-like contraption in which the oil burns directly in a flame. A. That's right.
Q. And not by means of any wick? A. That is the way I believe it was. I may be wrong, but I am quite sure that that is it."
*462 Plaintiff testified that "we saw these flames through the window and from the side of the house and they were rolling"; that plaintiff saw these flames from the firehouse which was a short distance away; that when they got to the house they saw that the flames "went up quite high. * * * I don't know if it quite hit the ceiling. It was very hot up there. You couldn't touch it." The house was filled with heavy smoke which appeared to be in layers and which severely restricted their zone of vision. The firemen extinguished the salamander and then plaintiff and another fireman, McChesney, went upstairs to see if the salamander's flames had ignited a fire there. Plaintiff walked up a five-step flight of stairs, with McChesney preceding plaintiff and carrying a port light called a "quarter mile beam." The investigation upstairs revealed no fire but plenty of smoke. The two men then started back down, plaintiff leading the way and McChesney right behind him with the light. This light was also described by McChesney as a "two-beam light"; one casting a spot beam and the other casting a broader beam but "not quite a flood." He could not recall which beam he had on at that time.
Plaintiff testified that he mistook a layer of smoke for a stair and stepped off the balcony which did not yet have a railing around it, and fell sustaining his injuries. There is no doubt that plaintiff was aware of the absence of the railing prior to the fall, for he so testified. McChesney described this incident as follows:
"Q. So now do I understand your testimony to be that what happened was the Captain came out at an angle and walked directly ahead towards the edge of the balcony? A. Yes, that's correct.
Q. You were then in the bedroom following him out? A. I was directly in back of him following him out, yes.
Q. So the two of you came out at an angle and he walked right off the edge of the balcony? A. He came out of the bedroom and fell.
Q. Is that the way it happened? Is that what you tell us, that you and he were in the master bedroom and he started at an angle out of this bedroom, the master bedroom, as my pointer indicates, at an angle, and then stepped off the edge and you were somewhere about two, three or four feet behind him with the light? A. That's correct."
*463 McChesney also testified that "I was right in back of [plaintiff]" at the time he fell, "maybe two or three feet"; "I was carrying it [the light] and it was directly out in front of me"; "I will say it [the light] was just to the right of his body"; and "I had the light in my right hand and it was going past his right leg."
There is thus abundant testimony that this particular salamander perilously went out of control on two previous occasions within five days of plaintiff's fall, and that defendant was warned by a fire department officer to keep a man on watch whenever the salamander was in use. If one views the evidence and the inferences therefrom in the light most favorable to plaintiff, one cannot agree with the majority's inferences. It states, referring to the calls of March 1 and March 2, that: "There was some question as to whether there was any real need for the fire company to be called on these occasions, but that is of no moment"; that "the reason for the admonition about its [i.e., the salamander's] future use was not because it might endanger firemen or any one else, or even cause property damage, but rather to avoid the annoyance and trouble of unnecessary visits by the firemen"; and again, that "It seems to us unsound to say that appellant should be held to foresee that lack of appropriate precautions in operating the salamander, even after the prior incidents, involved an appreciable chance of injury to one in the situation of plaintiff, especially when the precautions had been suggested to avoid the annoyance of unnecessary responses by the fire department."
The only possible basis I can find for the majority's inferences is the testimony of Mulvihill that a salamander in a darkened building could give the appearance of a fire from the outside. As the firemen testified that this specific salamander was overheated and flaming on all three occasions, that there was much smoke present, that the firemen saw fit to extinguish the salamander, and that defendant was warned not to leave it unguarded, it seems hardly reasonable to infer that there was no real need for the firemen to come and to imply that the calls were the result of officious *464 neighbors. This is particularly so in view of the majority's concession that "If the air intake remains properly set it burns without flame or smoke coming out of its stack." The question at least was for the jury to decide.
Allowing all favorable inferences to plaintiff, it could be found that the salamander got out of control on two previous occasions, and that appellant was warned to have some one nearby when it was in use. The jury could have found that he, nevertheless, completely ignored the previous eruptions, disregarded the fire department's instructions for safety, and the same result occurred a third time. Does this constitute wanton negligence? The majority states that as a matter of law the answer is in the negative. I certainly would not hold that wanton negligence was established as a matter of law. But I would hold that a question for the jury, in view of the facts of this case, had been posed.
In Staub v. Public Service Railway Co., 97 N.J.L. 297, 300 (E. & A. 1922), the court said:
"To establish a willful or wanton injury it is necessary to show that one with knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result."
The rule of the Staub case is quoted, approved and elaborated upon in King v. Patrylow, 15 N.J. Super. 429, 433-434 (App. Div. 1951), and also in Egan v. Erie R. Co., 29 N.J. 243 (1959). The King case makes clear that wanton negligence imposes liability even in favor of a mere licensee, even though there be no positive intent to do injury to him. See also 38 Am. Jur., Wilful and Wanton Acts, § 48, p. 692; Restatement, Torts, §§ 500-503. And see cases cited in Restatement, Torts, N.J. Annotations, § 482; Prosser on Torts, 150-151 (1955).
It is clear to me that, if the jury found appellant did have knowledge of the fact that the salamander went out of control twice, appellant must be held to have constructive if *465 not actual knowledge that injury might result from another such incident. There is danger of injury to firemen while fighting any fire. It is true that we do not hold an owner liable each time a fireman is injured while attempting to protect the owner's property or life. But this does not mean that the owner should escape liability when a fireman, or any one else, is injured as a result of a fire or its resulting smoke which the owner was aware was imminent unless he took comparatively easy preventive steps.
The majority presents this analogy:
"* * * We conceive this case is not legally different in essentials from one where an oil burner in an occupied home catches fire because the owner carelessly neglected to have it cleaned, emits flame and spreads thick smoke throughout the house, and a fireman, not familiar with the premises, falls down the stairs because he fails to see them due to the smoke. The law seems clear that there would be no liability in such instance for an occupier is not liable to a fireman merely because the fire  the beginning point in the chain of circumstances leading to injury  was caused by his negligence. 2 Harper and James, The Law of Torts (1956), p. 1503. If the contrary were so a person would act at his peril every time he turned in an alarm. Fire departments are publicly maintained and firemen enter into their hazardous occupation to fight all fires, no matter how caused."
I agree with the majority as far as it goes, but the analogy does not go far enough under the particular facts of the instant case. Assume the oil burner owner had to call the firemen several times within a few days because his burner emitted flame and thick smoke. Assume further that the fire department had warned the owner to have a certain part of the furnace repaired or to take a certain simple precaution to prevent any recurrence and to prevent danger to life and property. I would hold that if such owner, in effect, scoffs at the department's warning and does not bother to repair the furnace, or take the necessary precautions, he would definitely be liable for injury to a fireman or anyone else, so long as the injured person is not guilty of wanton contributory negligence. 2 Harper and James, The Law of Torts, § 22.6, p. 1214.
*466 The majority states, referring to its holding, that "if the contrary were so a person would act at his peril every time he turned in an alarm." My answer is that a person who is willfully and wantonly negligent should be held liable if the reason for turning in the alarm stems from his reckless and indifferent act in failing to heed the warnings. Staub case, supra. His alternative, not a difficult one, is to take the comparatively easy precautions and thus refrain from wanton negligence.
The majority further holds that even assuming that the salamander had functioned improperly on two previous occasions and that appellant had been warned thereof, there is still no liability, as it stated above: "It seems to us unsound to say that appellant should be held to foresee that lack of appropriate precautions in operating the salamander, even after the prior incidents, involved an appreciable chance of injury to one in the situation of plaintiff, especially when the precautions had been suggested to avoid the annoyance of unnecessary responses by the fire department." As I view these facts, it was certainly foreseeable that, if the salamander erupted again, a fire might occur, that firemen would fight the blaze, and that there would be the everpresent danger of injury to a fireman while fighting almost any blaze. I would hold that under the facts and inferences most favorably interpreted on behalf of plaintiff, it was at least a jury question whether appellant's acts and omissions were such that he should be held to have had constructive knowledge "that injury will likely or probably result from his conduct." Staub, supra [97 N.J.L. 297]; In 2 Harper and James, § 16.15, p. 954, we note:
"It is submitted that no particular state of mind should be required for a finding of wanton or willful misconduct. If defendant's conduct, in the light of circumstances which he knew or should have known, involved a high degree of manifest danger, that should be enough without regard to defendant's mental attitude." See also Prosser on Torts, 151, supra.
An alternative theory is proposed, aside from that concerning wanton negligence, upon which I base my disagreement *467 with the majority. Basically this alternate theory is that, even assuming the absence as a matter of law of wanton negligence, nevertheless defendant violated a duty owing to one with plaintiff's status. The situation referred to is that involving dangerous activities on the owner's land arising out of negligence.
The authorities have generally considered a fireman "a mere licensee" to whom no duty is owed to keep the premises in a reasonably safe condition. Barnett v. Atlantic City Electric Co., 87 N.J.L. 29, 31 (Sup. Ct. 1915). See also Campbell v. Pure Oil Co., supra. But cf. Meiers v. Fred Koch Brewery, 229 N.Y. 10, 127 N.E. 491, 13 A.L.R. 633 (Ct. App. 1920); Restatement of Torts, § 345.
More recently in Bango v. Carteret Lions Club, 12 N.J. Super. 52, 55 (App. Div. 1951), certification denied 7 N.J. 347 (1951), involving a policeman who was injured, this court leaned towards adopting the "more than mere licensee" view of the Restatement and Meiers case. Judge Bigelow said:
"A person who induces others to come upon his premises is under a duty to exercise reasonable care for their protection. He is not necessarily relieved of responsibility by the circumstance that the danger is created by an independent contractor. [citation] His duty extends to protection against the acts of third persons if he ought reasonably to have anticipated the occurrence. [citations] * * * The duty runs in favor of one who is not an invitee but who, like the plaintiff in the instant case, attends in the performance of a public duty. Restatement, Torts, § 345, illustration 2 and comment d. Cf. Barnett v. Atlantic City Electric Co., 87 N.J.L. 29 (Sup. Ct. 1915). But in order that the defendants be held liable, it must be shown that they had such degree of control that they could have averted the danger, or such superior knowledge that they should have foreseen and given warning of a danger not apparent to plaintiff."
Although I do not find it necessary to decide the exact status of a fireman on the land to put out a fire, I would certainly hold that the duty owed to him is no less than that owed to a "mere licensee." And such a person "can always sue for negligence in the course of things done on the land; his disability [to sue] relates to the static condition of the premises, expressed in the doctrine that the licensee must *468 take the premises as he finds them." Taneian v. Meghrigian, 15 N.J. 267, 276 (1954).
This principle was expressed by Judge Goldmann in Cropanese v. Martinez, 35 N.J. Super. 118, 124 (App. Div. 1955), wherein he quoted from the Restatement of Torts, § 341, that:
"`A possessor of land is subject to liability to licensees, whether business visitors or gratuitous licensees, for bodily harm caused to them by his failure to carry on his activities with reasonable care for their safety, unless the licensees know or from facts known to them, should know of the possessor's activities and of the risk involved therein.'"
The Appellate Division reversed the trial court's judgment of involuntary dismissal which had been granted on the ground that plaintiff was a mere licensee and defendant liable only for willful or wanton acts of negligence. Cf. Taylor v. New Jersey Highway Authority, 22 N.J. 454, 462-465 (1956). The rule of the duty owed to licensees as regards activities on the land is stated in 2 Harper & James 1476 (1956):
"* * * it is now generally held that in cases involving injury resulting from active conduct, as distinguished from conditions of the premises, the landowner or possessor may be liable for failure to exercise ordinary care towards a licensee whose presence on the land is known or should reasonably be known to the owner or possessor."
See also 49 A.L.R. 778 (1927); 156 A.L.R. 1226 (1945).
In Mistretta v. Alessi, 45 N.J. Super. 176, 179 (App. Div. 1957), Judge Clapp stated:
"However, early in this era it was said that in connection with a licensee or social guest the occupier must take reasonable care to avoid `active wrongdoing'  that is, to avoid creating any condition upon the premises which could reasonably be regarded as a dangerous instrumentality."
And in Imre v. Riegel Paper Corp., 24 N.J. 438, 443 (1957), Mr. Justice Heher said:
*469 "The possessor of land is liable for the reasonably foreseeable injurious consequences of the use of a dangerous agency on the land. However it may be phrased, this doctrine of liability for hurt to others is basic to the common law. Where an act carelessly done would be highly dangerous to the personal safety of others, the common law raises a `public duty' of care commensurate with the risk of harm. Strang v. South Jersey Broadcasting Co., 9 N.J. 38 (1952). Fire has ever been deemed `a dangerous as well as a beneficial agency, to be handled with care', and liability does not necessarily depend on invitation but may be grounded in `responsibility for a dangerous agency,' citing Van Winkle v. American Steam Boiler Co., 52 N.J.L. 240 (Sup. Ct. 1890), Beasley, C.J.; the one `who sets a fire and is negligent in setting or guarding it is liable if damage results'; the test is whether `injury to the plaintiff or to a class of which the plaintiff was one ought reasonably to have been anticipated,' citing Piraccini v. Director General of Railroads, 95 N.J.L. 114 (E. & A. 1920), Swayze, J."
I disagree with the majority's conclusion that a salamander is no different than any other heating apparatus and refer to the necessity for legislation regarding salamanders. (R.S. 34:X-XXX-XXX). I would hold that it was for the jury to determine whether this salamander, which had erupted on three occasions within five days and the owner of which had been warned, and had failed to heed the warning against further use without an attendant, was a dangerous activity arising out of negligence. If the salamander was such a dangerous activity, then there was a duty of ordinary care owed to one in plaintiff's position, Taneian case, supra, 2 Harper & James 1476; whether he be considered a mere licensee, Barnett case, supra, or something more, Bango case, supra, and Meiers case, supra.
With the duty established, it is clear that it was at least a jury question as to whether defendant violated that duty and whether defendant's negligence was the proximate cause of plaintiff's injuries. Pertinent here is the language of Mr. Justice Wachenfeld in DeRienzo v. Morristown Airport Corporation, 28 N.J. 231, 239 (1958):
"In determining whether or not there was negligence, `[t]he test is one of probability. The evidence must be such as to justify an inference of probability as distinguished from mere possibility.' *470 Flexmir, Inc., v. Lindeman & Co., 4 N.J. 509, 514 (1950). And on a motion for dismissal:
`* * * The question is whether the trier of the facts could, on any reasonable view of the evidence, rejecting all evidence and inferences unfavorable to the plaintiff, find that the plaintiff had established the facts essential to his asserted cause of action. Is there any evidence which, if accepted and given its fullest probative force, reasonably tends to sustain the pleaded cause of action? * * * Are there facts in evidence which if unanswered would justify men of ordinary reason and fairness in affirming the question which the plaintiff is bound to maintain?' Shellhammer v. Lehigh Valley R. Co., 14 N.J. 341, 345 (1954).
If `fair minded men might honestly differ as to the conclusions to be drawn from the proofs, the questions at issue should be submitted to the jury.' Scarano v. Lindale, 121 N.J.L. 549, 550 (E. & A. 1938)."
Under these principles a jury could have found (a) that appellant was negligent in allowing the salamander to remain unguarded after the two previous incidents evinced the instrument's dangerous character; (b) that appellant was guilty of wanton negligence in which case plaintiff's status would be immaterial; and (c) that the fire from the salamander caused the smoke to fill the house, thus preventing plaintiff from seeing the steps so that he fell and proximately causing plaintiff's injuries. I would hesitate to extend such liability regarding firemen when it is a condition upon land that is involved. But a dangerous activity (as a jury could find this overheating salamander to be) arising out of negligence is inexcusable. A court would not be imposing an undue burden upon such a landowner in holding him liable for such negligent activity, or failure to take the comparatively easy safeguards.
I next consider appellant's contention that an independent contractor was responsible for the care and control of the salamander and that the independent contractor, if any one, and not appellant was responsible. As appellant admittedly owned the salamander and the premises and frequently inspected the work of his sub-contractors, a jury could find from the previous incidents that defendant furnished a defective and dangerous salamander to the sub-contractor. In such a situation defendant would be the responsible party. *471 Bango case, supra (12 N.J. Super., at page 55). Cf. Restatement, Agency, § 213; Levine v. Bochiaro, 137 N.J.L. 215 (E. & A. 1948); Meny v. Carlson, 6 N.J. 82, 99 (1950); Gibilterra v. Rosemawr Homes, 19 N.J. 166 (1955). That the owner may be held liable for giving the contractor faulty equipment is made clear by Judge Goldmann in Bergquist v. Penterman, 46 N.J. Super. 74, 84 (App. Div. 1957), certification denied 25 N.J. 55 (1957):
"The employer of an independent contractor will also be held liable if the work was of a kind which the employer should have recognized would during its progress necessarily create the danger of the mishap which occurred, and thus contained or involved an unreasonable or peculiar risk of bodily harm to plaintiff unless special precautions were taken. 2 Restatement, Torts, §§ 413, 416, pp. 1118, 1128 (1934)."
I would hold that it was a jury question as to whether appellant or the independent contractor was in the care and control of the salamander, whether appellant furnished defective equipment and whether appellant knew the work involved an unreasonable risk of harm.
In its motions for dismissal appellant strenuously argued that the balcony without a railing could not constitute a nuisance or negligence as plaintiff failed to prove any deviation from standards of construction. Plaintiff's case clearly shows that it is the defectively operating salamander, not the absence of a balcony, which constituted the claimed negligence and proximate cause. In passing I point out that it is not incumbent on plaintiff to prove a deviation. Defendant has the burden of proving conformance to a standard. Shafer v. H.B. Thomas Co., 53 N.J. Super. 19 (App. Div. 1958).
Turning to the allegedly defective charges, I am in agreement with the majority's determination that the charge concerning the violation of R.S. 34:5-142 et seq. constituted reversible error. But I do not agree that the trial court's granting of plaintiff's three requests to charge was reversible error.
*472 In view of the conclusion I would reach concerning the charge regarding the violation of the statute, I would reverse and remand for a new trial.