68 N.J. Super. 305 (1961)
172 A.2d 237
ASSOCIATED METALS AND MINERALS CORP., A NEW YORK CORPORATION, PLAINTIFF,
v.
DIXON CHEMICAL & RESEARCH, INC., A NEW JERSEY CORPORATION, DEFENDANT AND THIRD-PARTY PLAINTIFF,
v.
GLENS FALLS INSURANCE COMPANY, A NEW YORK CORPORATION, THIRD-PARTY DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided June 21, 1961.
*307 Mr. Charles Danzig argued the cause for plaintiff (Messrs. Riker, Danzig, Marsh & Scherer, attorneys).
Mr. Theodore Geiser argued the cause for defendant and third-party plaintiff (Messrs. Shaw, Pindar, McElroy & Connell, attorneys).
Mr. John J. Budd argued the cause for third-party defendant (Messrs. Budd, Larner & Kent, attorneys).
PINDAR, J.S.C.
Plaintiff, Associated Metals and Minerals Corp., a New York corporation (hereafter called New York), in an original complaint filed in this court sought as a primary matter of relief a restraint against certain operations of Dixon Chemical & Research, Inc. (hereafter called Dixon). This pleading disclosed the alleged damage of large quantities of New York's steel due to the continuous contact of said steel with deposited particles of sulphur. It was further alleged the said particles of sulphur came from a sulphur pile maintained and controlled by Dixon located on its leased premises which were adjacent to premises on which New York maintained large quantities of steel. A preliminary restraint was allowed and pending the restraint hearing Dixon discontinued the aforesaid operations, and the aforementioned issue accordingly became moot, unless reoccurring.
Under an additional cause New York sought a money judgment grounded on negligence and nuisance for damages resulting from corrosion by reason of the wrongful deposit of sulphur by Dixon upon its aforesaid property.
Thereafter, the litigation involved profuse proceedings which included the filing of a supplemental complaint by New York, which was later abandoned, and by Dixon for an order to transfer the issue of damages to the Law Division for a jury trial, or as an alternative if jurisdiction was continued in the Chancery Division that a trial by jury be granted. Included, also, were contested proceedings of Dixon *308 to add a cause of action against Associated Metals and Minerals Corp., a New Jersey corporation (hereafter called New Jersey), an affiliate of New York, New Jersey being duly assigned certain leases entered into by New York and the Port of New York Authority. All supplemental proceedings were denied as appears from the opinion of Judge Kolovsky, reported in 52 N.J. Super. 143 (Ch. Div. 1958), and his order of December 2, 1958, and also from the orders of this court entered by virtue of letter opinions dated November 5, 1959, January 5, 1960 and February 24, 1960, filed herein.
In addition, Dixon filed a third-party complaint against Glens Falls Insurance Company, a New York corporation (called Glens Falls hereafter), under a certain manufacturers' and contractors' liability policy alleged to afford coverage for damages recoverable by New York against Dixon as caused by the aforesaid operations with respect to storage and maintenance of the sulphur.
Thereupon, the related issues were joined and the matters were pretried with the allowance of further discovery. As appears in the pretrial order the action of Dixon against Glens Falls was severed with direction that it be prosecuted after the close of proofs in the action by New York against Dixon. Such was the course followed and the separate trials by the court without a jury were fully heard, which consumed approximately six weeks. A mammoth record of documentary proof and extensive testimony by several witnesses was produced. All issues were orally argued and briefs were filed.
In order to comprehend the extensiveness of the litigated issues, a detailed resume is necessary.
About February 1956 a location within the area of Port Newark, Essex County, New Jersey, was leased from the Port of New York Authority by New York (subsequently assigned to New Jersey) for the purpose of making the leased premises available for the operations of New York, as a location for storage of structural steel amounting to *309 several million pounds, being "I" beams, "H" beams, channels and angles, which New York had purchased from various foreign markets for delivery there via ships which were to be wharved at Port Newark. Initial delivery of the steel commenced prior to September 1956, the bulk of which was received in July 1956. Subsequent deliveries and storage of the steel followed until a final date in April 1957. To meet the expected deliveries of steel under contract, three parcels of land were leased which comprise the full area of the aforesaid storage operations. The first parcel was acquired about February 1956, the second about October 1956, and the third about November 1956; the said parcels made up a contiguous rectangular area.
In the interest and purpose of storing sulphur Dixon leased a parcel of land situated likewise in the Port Newark area, from the Port of New York Authority, which storage was commenced subsequent to the initial date of delivery and storage of the heretofore mentioned steel. With significance it is noticed that the location leased by Dixon was contiguous to the first parcel leased by New York (subsequently assigned to New Jersey). Further, the sulphur was delivered to wharves by boat and transported by truck to the leased premises of Dixon where it was mounded by the utilization of bulldozers in a manner described in the record. It is also noticed that Dixon discontinued delivery of sulphur to its leased location about September 20, 1956. However, the sulphur in a reduced quantity remained at the stated location for about a year before complete removal.
The gravamen of the cause of damages has relation to the failure of Dixon to reasonably maintain and control the assumed storage of the sulphur product in such a manner that sulphur would not unreasonably interfere with the use and enjoyment of the adjacent leased premises of New York, that is to say, sulphur would not create a nuisance.
Dixon denies all liability by reason of an utter lack of negligence on its part, or, if any existed, urges the absence of any showing of damages as a proximate result of such *310 negligent conduct. In the manner of separate affirmative defenses Dixon avers that New York was guilty of contributory negligence and of assumption of risk, stressing that under either principle recovery would be barred.
In the case of Sans v. Ramsey Golf & Country Club, Inc., 29 N.J. 438 (1959), at p. 448, Justice Francis said:
"The essence of a private nuisance is an unreasonable interference with the use and enjoyment of land. The elements are myriad. The law has never undertaken to define all of the possible sources of annoyance and discomfort which would justify such a finding. Pollock, Torts (1887), 260, 261. Litigation of this type usually deals with the conflicting interests of property owners and the question of the reasonableness of the defendant's mode of use of his land. The process of adjudication requires recognition of the reciprocal right of each owner to reasonable use, and a balancing of the conflicting interests. The utility of the defendant's conduct must be weighed against the quantum of harm to the plaintiff. The question is not simply whether a person is annoyed or disturbed, but whether the annoyance or disturbance arises from an unreasonable use of the neighbor's land or operation of his business. Prosser, Torts (2d ed. 1955), 410. As the Court of Appeals of Ohio put it in Antonik v. Chamberlain, 81 Ohio App. 465, 78 N.E.2d 752, 759 (1947):
`The law of nuisance plys between two antithetical extremes: The principle that every person is entitled to use his property for any purpose that he sees fit, and the opposing principle that everyone is bound to use his property in such a manner as not to injure the property or rights of his neighbor.'"
The initial position that Dixon is faced with is its own conduct in the manner and means it assumed to adopt the leased location to accommodate the storage of sulphur, including the eventual deposit of sulphur particles upon plaintiff's steel at the aforementioned location. The character of the area here as described by the evidence is directly disputed. From the standpoint of Dixon it is adaptable for the storage of sulphur but inappropriate for steel. That is to say, elemental sulphur in its natural state being harmless to steel under ordinary atmospheric conditions, placement of it on the Dixon premises was not a wrongful act but in fact a lawful use and operation. While this legalism can be accepted to the extent of a rightful undertaking, it is *311 significantly established by the evidence that sulphur dust or particles thereof exposed to sunlight, air and moisture will chemically react to form sulphuric acid, an acid that is corrosive to steel. The latter expression of occurring corrosion can be presented by the chemical reactions stated hereafter.
Sulphur particles + Air + Sunlight react to form Sulphur Dioxide.
Sulphur Dioxide + Moisture react to form Sulphurous Acid.
Sulphurous Acid + Air react to form Sulphuric Acid.
Dilute Sulphuric Acid reacts with iron (steel).
What then was the duty of Dixon? Clearly, it was obliged to so control the acquired sulphur product in such manner of maintenance as to prevent improvident depositing of this sulphur dust or particles in the moist atmosphere upon the adjoining steel of New York. If the conduct of Dixon was otherwise, then the subjection of damages would follow for any injury that would result to New York from this particular product. A clear and convincing weighing of the testimony, including the photographs, moving pictures and documentary evidence related to transactions, establishes the fact that contact of particles of sulphur upon the stored steel had an approximate relationship to a failure by Dixon to exercise reasonable care. The quantities of escaped and uncontrolled particles of sulphur were unconfined and permeated the atmosphere within the whole area where the steel was contained.
Moreover, the probable eventful incident of occurring damage is evident in the contention of Dixon under the aforementioned separate defenses. In that respect Dixon charges contribution toward, and assumption of, damages on the part of New York by its selection of the subject area for storage of steel. This action of New York is said to have been inappropriate. Surely, such knowledge of Dixon as to New York's operations called for that degree of prudent conduct with the advent of sulphur which would *312 be ordinarily safe to the reasonable avoidance of damage. Dixon transported, mounded, retained and removed the accumulated sulphur in a manner which unreasonably transmitted sulphur particles upon the steel of New York.
Notwithstanding the foregoing, the asserted affirmative defense will be considered. Specifically, this attack is urged on several grounds: (a) New York in storing the steel (that is to say, subsequent storage) did so in the face of the existing sulphur pile; (b) New York failed to take reasonable precautions to protect its property; and (c) the storage area selected by New York was not appropriate because it was located in the vicinity of industries which emitted fumes and gases with corrosive effect, unrelated to the occasion of sulphur deposits.
As to item (a) it is undisputed that part of the leased area was acquired after New York had completed the contract for the purchase of the European steel for subsequent delivery to the leased area, which included all arrangements for transportation to Port Newark by the process of various means of shipping involving the course and dates of delivery. Further, the great quantity of steel purchased in the foreign markets required the fully leased area. The impracticability of altering the consigned location is evident by the proof which is significantly inept in view of the absence of a showing of any other comparable means for New York to perform under the purchase contracts. Otherwise, but not a matter to be decided here, the contractual obligations of New York would have defaulted. What is certain in the proof is that Dixon assumed to commence and to continue operations for the use of its interest in sulphur after actual notice and with full knowledge that the area where the warehousing of steel by New York was evident.
As to item (b) the disclosed quantity of the involved steel must be regarded. The proof in this respect indicates that the means of protection against corrosion undertaken by New York upon the advent of the sulphur was reasonable. The evidence shows that within the bounds of practicability *313 New York resorted to the adequate use of tarpaulins and adapted the use of an appropriate kind of oil substance to prevent corrosion. Evidence that other steps or precautions would bind New York to more reasonable conduct is unconvincing, and would have been prohibitive of accomplishment. Moreover, in contradistinction Dixon utilized no means or manner of protection to control escaping sulphur particles, although procedure therefor was discussed and evidently available at least to lessen damage.
As to item (c) the evidence is contradictory. Dixon's persistence that the selection of the subject leased area was primarily critical for the adequate operations to warehouse steel is not credibly sustained. The related proof of the chosen vicinity indicates some existing industrial activities but no sufficient or convincing evidence is proffered identifying any probable proximate resulting effect of said industries as the cause of the accelerated corrosion for the averred reason. Except for a vague showing that in the surrounding area industries exist, such proof is wholly unconnected with any proximity to resulting damages. Thus, this deficiency of evidence leaves the actual deposit of sulphur particles from the pile developed by Dixon upon the property of New York as the proximate cause of steel corrosion with the adequate causal connection of damage. It is noticed that the record contains direct proof of the conduct of Dixon and that resulting damages do not depend upon circumstantial evidence. The fact of sulphur deposits on the steel is inescapable, only the quantities and extent are factually disputed.
A review of conduct on the part of Dixon supports by a preponderance of the evidence that the said conduct did accelerate the rate of corrosive deterioration of the steel in question. In this aspect the proof is in factual dispute. Careful appraisal and weighing of the evidence sustain believableness that by described tests the resulting corrosion in this case was more than would be normally expected and as a reasonable probability caused by the occurring deposits of sulphur particles.
*314 In the light of the foregoing upon a finding of fact and under applicable law the liability herein charged is established upon the wrongful maintenance of a nuisance by reason of the neglect of Dixon, which was a proximate cause of resulting damage to the steel property of New York, and it is established that the conduct of New York was neither in fact nor in law a matter of either contributory negligence or assumption of risk to bar a recovery.
This brings me to plaintiff's claim for ensuing damages. To properly approach this element of the action an exhaustive review of voluminous documents was required, including a careful study of the appropriate measure to be utilized. Noticeably pertinent to this approach is the described manner the steel here involved was marketed by New York. The evidence shows that the accepted and uncontradicted knowledgeable means for sale of represented undamaged structural steel was by direct order, whereas, upon the obligatory disclosure of damaged steel all sales required precedential inspection. The latter method was forced upon New York by reason of the impregnation of the related depositing of sulphur particles and substantially reduced the value of the steel. Furthermore, it is significant to notice that ultimate disposal of the subject steel by way of salvage would probably produce the greatest loss. The proof shows that in salvaging the kind of steel in dispute at bar it would have been necessary to meet the cost of cutting the full lengths of 14 to 16 feet into pieces not larger than 2 feet long and to suffer the expense of transportation to and from the cutting location to complete the state of salvage.
The ultimate result reached will be stated in the manner of totalized aggregation deduced from the several factors of a competent showing of loss.
Generally the measure of damages for the loss or destruction of personal property in cases of this type, being a situation in the stream of commerce, is the difference between its market value, if it has a market value, immediately before and immediately after the injury. In order for it *315 to be said that a thing has a market value, it is necessary that there shall be a market for such commodity  that is, a demand therefor and an ability from such demand to sell the same when a sale thereof is desired. Where, therefore, there is no demand for a thing and no ability to sell the same, then it cannot be said to have a market value and the recovery in such case is generally the difference between its actual value as of the time and place immediately before its destruction and the value received upon securing sale, or if not sold the salvage value after the damaged condition. Further, if the property is not substantially destroyed and the injury is susceptible of repair at a reasonable expense, and the property can be repaired at less expense than the difference in its value before and after injury, then this repair expense is to be taken as the measure of damages.
Upon a review of the facts involved in this case, and in view of the aforementioned discussion of the measure of damages, I find in the first instance that the plaintiff has not sustained the burden of showing to this court that there was such demand for the steel at the time of the occurring injuries to effectuate a sale of the entire supply of the steel in the yard, nor in fact did plaintiff show that a substantial portion of this steel was demanded. Therefore, we cannot concern ourselves with the fair market value of the steel in its prime condition but rather we must be concerned with the actual values herein involved. The value of the steel when at Port Newark is the cost of purchasing the steel in Europe in addition to the subsequent transportation charges to Port Newark; the storage charges in this particular instance do not enhance the value of the steel. A review of Exhibits P-42 and P-43 indicates that the computation of the aforementioned values is permissible.
Exhibit 42, in particular column 16 (number of pounds of steel disposed of as of December 31, 1958), and column 6 (cost of the steel per 100 lbs. before storage charges), enables the computation of the cost of the steel disposed of as of December 31, 1958. Further, Exhibit 42 presents the *316 amount realized from such disposals; refer column 17. The difference between the aforesaid values, $96,675.99, is the damages sustained as of December 31, 1958.
Exhibit 43, in particular column 10 (number of pounds of steel disposed during the years 1959-1960), and column 6 of Exhibit 42 enable the computation of the cost of the steel disposed during the years 1959 and 1960. Further, Exhibit 43 presents the amount realized from such disposals; refer column 11. The difference between the aforesaid values, $146,509.92, is the damage sustained during 1959-1960.
Exhibit 43, in particular column 12 (number of pounds of steel disposed after December 31, 1960), and column 6 of Exhibit 42 enable the computation of the cost of the steel disposed after December 31, 1960. Further, Exhibit 43 presents the amount realized from such disposals; refer column 11. The difference between the aforesaid values, $57,161.67, is the damages sustained after December 31, 1960.
From the aforementioned, a grand total of $300,347.58 is computed as the total amount of damage sustained.
The factual record comprising the third-party action sub judice is presented for the most part by stipulations, and for clarity will be related as follows:
On August 1, 1956, Glens Falls issued to Dixon a certain manufacturers' and contractors' liability policy known as MC16000. The terms and provisions of the accorded insurance coverage having pertinence herein are set forth under the following quoted paragraphs:
Coverage B-Property Damage Liability: "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, * * * caused by accident * * *."
Definition of Hazards.
Division 1-Premises-Operations: "The ownership, maintenance or use of premises, and all operations."
Defense, Settlement, Supplementary Payments: "With respect to such insurance as is afforded by this policy * * * for property damage liability, the company shall:

*317 (a) defend any suit against the insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;"
As written conditions the policy provided as follows:
Notice of Accident: "When an accident occurs written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practicable. Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the accident, the names and addresses of the injured and of available witnesses."
Notice of Claim or Suit  Coverages ** B: "If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative."
Action against Company  Coverages ** B: "No action shall lie against the company unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy * * *."
During the effective policy period the insured acquired knowledge of the probable effect of a certain condition of eye irritation suffered by employees of New York, allegedly from the heretofore mentioned sulphur pile, and of the probable development of the sulphur deposits' being harmful to the steel of New York as hereinbefore described. In the first instance this knowledge was acquired in the month of September 1956, and in the latter instance it was acquired early in February 1957. Both circumstances became matters of concern as disclosed in the manner of meetings and conferences, and correspondence by the officers and agents of New York, Dixon and the Port of New York Authority. However, Dixon rendered no notice of the foregoing to Glens Falls and no knowledge was acquired by Glens Falls until the commencement of the primary suit herein when a copy of the summons and complaint was forwarded to the insurer in July 1957. This situation involved a respective lapse of approximately ten and five months after the aforesaid incidents *318 and before the undisputed date of first notice of any claim by Dixon to Glens Falls. Therefore, the event of liability insurance coverage becomes a question of law under judicial interpretation and construction of the terms and provisions of the policy.
The contra contentions of the insured and the insurer can be classified in two aspects: (1) Was the aforestated disclosure of incidents of eye irritation and the depositing of sulphur particles of such nature and contractual effect as to require and obligate Dixon to comply with the provisions of the "Notice of Accident" clause?  and (2) Was the claim of New York for damage to its steel such as to be within the provisions of "Coverage B" as having been "caused by accident"?
As to item (1) it is noticed that no actual claim by New York for any damage to the subject steel was directly made upon Dixon until the institution of suit. What then was the obligation of Dixon under the contract of insurance to comply with the giving of notice requirement?
Consideration of the foregoing has relation to what is the common meaning and purpose of the provisions of "Notice of Accident." Clearly, the purpose of this provision is to allow the insurer to form an intelligent estimate of its rights and liabilities, to afford it an opportunity for investigation and to prevent fraud and imposition upon it. However, it is not directed to the incidents of occurring claims which are so trivial as to relieve prudent action or lack foresight of a probable suit for damages. Hence, the requirement of notice to the insurer and the cooperation of the insured under the circumstances shown are in essence questions of fact for the trial court, and the ultimate disposal of the question of contractual liability. The conduct of Dixon in the maintenance and control of the sulphur pile was undeniably the basis of the complaints above mentioned. Whether or not a formal claim of damages was made by New York at the time of the initial notice to Dixon, or when the institution of the suit was actually undertaken *319 by New York, does not inevitably dispose of the contractual requirement of notice. In view of the nature of the here involved industrial operations, the fact that employees of New York suffered eye irritations, the fact that New York expended considerable effort to remove and prevent the deposits of sulphur particles, and the fact that complaints were made by New York to both the Port Authority and Dixon, this court finds that the occurring incidents were not mere triviality to relieve Dixon of its obligations under the provisions of "Notice of Accident." Furthermore, Dixon now insists that coverage exists under the questioned policy "because of accident." Thus, all concomitant contentions otherwise belie any position that the common likelihood of resulting damages did not require that "written notice shall be given by or on behalf of the insured to the company or any of its authorized agents as soon as practical."
Surely, the indubitable nature of the complaints in September 1956 and February 1957 were accordant with what the parties to the insurance contract had bargained for. Premiums and terms upon which liability insurance coverage against damage is extended comprehend the full consideration of the policy and a failure of due compliance with the provisions will warrant a denial of the afforded protection especially where, as here, the matter of insurance is restricted to performance by the insured of "a condition precedent"  the affirmative obligation that "written notice be given." Obviously, the conceded first notice by Dixon to Glens Falls accomplished only after service of the summons and complaint was untimely under the terms and provisions of the subject policy. Such failure of compliance with respect to the factor of a condition precedent amounts to a contractual bar to protection from the liability as charged sub judice.
In the case of Miller v. Zurich Accident, 36 N.J. Super. 288 (App. Div. 1955) Judge Conford, at p. 294, said:
"Since, as indicated above, performance of the conditions stated is made by the policy a condition precedent to recovery thereon, we are controlled by the rule that, in the absence of waiver or *320 estoppel, neither of which are here advanced, the company is entitled to assert substantial nonperformance of any condition as a defense to any proceeding against it on the policy, entirely without regard to whether or not it has been prejudiced by the default. Whittle v. Associated Indemnity Corporation, supra [130 N.J.L. 576 (E. & A. 1943)]; Bankers Indemnity Insurance Company v. A.E.A. Co., Inc., 32 N.J. Super. 471 (App. Div. 1954)."
And, at p. 296, the court said:
"While the question as to what is a reasonable time, depending as it does upon the surrounding circumstances, is ordinarily for decision by the jury or fact-finder, yet when the facts are undisputed and different inferences cannot reasonably be drawn therefrom the question is for the court."
Also, at p. 297, the court said:
"Policyholders who cooperate with carriers to minimize or avoid losses by reasonable compliance with policy requirements of notice of accident ought not to be indirectly saddled with the added costs attributable to unreasonable defaults by other insureds."
In the light of the foregoing it is concluded upon finding of fact and by applicable law that a judgment under the complaint be entered in favor of Associated Metals and Minerals Corporation, a New York corporation, and against Dixon Chemical and Research, Inc., in the sum of $300,347.58 damages; also that a judgment under the third-party complaint be entered in favor of Glens Falls Insurance Company and against Dixon Chemical and Research, Inc., no cause of action. The latter adjudication makes it unnecessary to determine further issues raised by the third-party action.
Counsel should present conformable judgment.