281 N.J. Super. 341 (1995)
657 A.2d 890
TRICO MORTGAGE COMPANY, INC., PLAINTIFF-RESPONDENT,
v.
PENN TITLE INSURANCE COMPANY, DEFENDANT-APPELLANT, AND ASSURED SEARCH AND ABSTRACT COMPANY, INC., DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued April 10, 1995.
Decided May 5, 1995.
*343 Before Judges DREIER, VILLANUEVA and BRAITHWAITE.
Thomas W. Sweet argued the cause for appellant (Levinson, Axelrod, Wheaton & Grayzel, attorneys; Mr. Sweet, of counsel and on the brief).
*344 James Greenberg argued the cause for respondent (Greenberg, Shmerelson, Weinroth & Miller, attorneys; Mr. Greenberg, of counsel and on the brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D.
Defendant Penn Title Insurance Company appeals from a judgment of $115,976.42, together with interest, entered against it. The judgment was based upon a mortgagee title insurance policy it issued to plaintiff Trico Mortgage Company, Inc. We affirm the liability but remand for modification of interest.
Ante Kojic, a Yugoslavian immigrant, worked as a painter until 1969 when he sustained a serious injury which caused him to be permanently disabled and unable to work. His wife, Marija Kojic, was a seamstress who earned a maximum $12,000 per year. The Kojics owned a home at 502 Brinkerhoff Avenue in Fort Lee.
On October 3, 1986, the Kojics' daughter, Mirjana, admittedly forged her parents' names without their knowledge and consent on a mortgage to Carteret Savings Bank and purportedly mortgaged her parents' property for $175,000. Mirjana also testified that she forged a power of attorney from her parents and later arranged for the fraudulent signatures of her parents on two other mortgages encumbering the property.
On July 27, 1987, Mr. and Mrs. Kojic's house was fraudulently mortgaged to two different mortgage companies. Mirjana either forged her parents' signatures on mortgage closing papers, or forged her mother's name while obtaining her father's signature without his knowledge of the contents of the documents. One mortgage of $308,700 was made to Eastern American Mortgage Corp. (Eastern American), which was subsequently assigned to Landmark Savings Association (Landmark).
The other mortgage of $134,400, executed earlier that day, was made to Federal Mortgage and Investment Corp. (Federal), which acted as a mortgage broker. Although Mirjana testified that she *345 brought her father to this closing and that he himself might have signed the mortgage, he was not proficient in the English language and did not understand the proceedings. In fact, neither parent knew that their daughter was mortgaging their property. Within four days of closing on July 27, 1981, Trico purchased the mortgage and received a mortgage assignment from Federal.
Federal failed to verify Mr. and Mrs. Kojics' employment and never questioned the income figures as represented. Prior to the closing, Federal had supplied Trico with what appeared to be Mr. and Mrs. Kojics' mortgage application which falsely indicated that they were employed by Mirjana's Fine Jewelry and Gifts, and earned annual incomes of $108,000 and $100,000, respectively. Trico failed to determine if the information was correct. In reality, Mirjana, the only employee of the gift shop, had falsified pay stubs, tax returns and statements relating to her parents' income.
No "bring down" search was ordered for the property by Trico, Federal or the attorney who represented Federal at the closing. The bring down search, had it been performed, would have shown the status of the property from the time of the previous title search obtained by Federal to the time of closing, and in this case would have demonstrated that a notice of settlement on the Eastern American mortgage had been filed as of July 20, 1987 and that Eastern American would also be claiming an interest in the property.
William Corrigan, executive vice-president of Penn Title, testified that if a bring down search had been conducted, Penn Title's agent, Assured Search and Abstract Company, Inc. (Assured), would have performed it. All Federal's closing attorney would have been expected to do was to call Assured and request the bring down.
Trico also neglected to secure itself by following through with a bring down search prior to the actual closing. Instead, Trico relied on a property search and an Attorney's Certificate of Title signed by Federal's closing attorney on July 27, 1987.
*346 After the closing of both the Eastern American and the Federal loans on July 27, 1987, Eastern American was the first to record its mortgage on July 30, 1987. Four days later the Federal mortgage purchased by Trico was recorded.
However, it was the responsibility of Penn Title's agent, Assured to make sure that everything was in order before issuing the title policy but Assured failed to do so. On August 3, 1987, Penn Title through Assured issued a title insurance policy to Trico on the Kojics' property which failed to disclose the Eastern American mortgage. The policy states, in part, in Paragraph 3(b) that
[t]he insured shall notify [Penn Title] promptly in writing ... (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest or the lien of the insured mortgage, as insured, and which might cause loss or damage for which [Penn Title] may be liable by virtue of this policy.
Paragraph 3(b) further states that
[i]f such prompt notice shall not be given to [Penn Title], then as to such insured all liability of [Penn Title] shall cease and terminate in regard to the matter or matters for which such prompt notice is required, provided, however, that failure to notify shall in no case prejudice the rights of any such insured under this policy unless [Penn Title] shall be prejudiced by such failure and then only to the extent of such prejudice.
Paragraph 12 of the policy states that all notices required to be given the Company
[including the number of this policy], shall be addressed to: Penn Title Insurance Company, Claims Department, 500 Court Street, Reading, PA 19601.
On April 5, 1988, Trico returned the first Kojic check not supported by sufficient funds. Within approximately one year, a representative from Trico telephoned Mrs. Kojic at home about the default on payments. Prior to that call, Mr. and Mrs. Kojic allegedly had no knowledge of their daughter's fraudulent activities. Mr. and Mrs. Kojic went with a Yugoslavian interpreter to Trico in March 1989, at which time Mrs. Kojic informed Trico employee Gerry Veglia that she was not aware of the purported mortgage on the property which had been assigned to Trico.
*347 On February 10, 1989, Trico forwarded the matter to attorney James Greenberg's office for foreclosure. A March 14, 1989 title search requested by Mr. Greenberg's office for Trico revealed that the $175,000 mortgage to Carteret Savings Bank was still open; a second mortgage to Landmark as assignee of Eastern American for $308,700 had been recorded; and consequently Trico, instead of being a second mortgagee as originally intended, found itself in third position on its $134,400 loan. Although Trico had actual notice of adverse interests affecting the title to the property at that time, nonetheless, Trico did not send notice to Penn Title regarding same.
Bob Haider, the Trico foreclosure manager, purportedly sent notice of a potential claim to Assured by letter dated August 24, 1989. Penn Mutual argues, as it did in the trial court, that there was no competent evidence at trial to prove that the notice of claim was actually mailed to Assured or received by either Assured or Penn Title.
On June 6, 1990, a sheriff's sale of the Kojics' property was held. Trico placed the highest bid and purchased the property for $372,000. Throughout this time, Penn Title claims it still had not been advised of the other outstanding mortgage held by Eastern/Landmark against the property, that foreclosure proceedings had been instituted, or that a sheriff's sale had been scheduled and held.
On June 21, 1990, Mr. Greenberg, on behalf of Trico, purportedly sent a letter to Assured stating that a claim was being made against the title insurance policy. Although the letter indicates that Penn Title was to receive a copy, Penn Title argues that there was no competent proof at trial that this actually occurred. Penn Title also asserts that a letter dated August 14, 1990 from Mr. Greenberg to Penn Title was the first notice that it received of any claim being made by Trico or of any problems associated with the status of the Trico mortgage. Penn Title also claims that it was from this letter that it learned of the sheriff's sale held June 6, 1990. Penn Title immediately responded to Mr. Greenberg's *348 letter and contacted Patrick Belardo of Assured. Penn Title then learned that Assured was having some business problems and was in the process of winding down its business.
On February 3, 1992, Trico filed a four-count complaint against Penn Title and Assured. In the first count Trico alleged that it purchased an assignment of mortgage from Federal Mortgage, and defendants negligently performed a title search on the property involved and failed to discover a notice of settlement filed by an intervening mortgagee. In the second count Trico alleged that Penn Title was liable under a mortgage title insurance policy it issued to Trico. In the third count Trico alleged the bad faith refusal of Penn Title to honor the mortgagee title insurance policy, and in the fourth count, that Penn Title was liable under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq.
Penn Title filed an answer denying the material allegations of the complaint and asserting affirmative defenses, including Trico's failure to comply with the notice provisions of the title insurance policy and consequent prejudice to Penn Title. Penn Title also asserted crossclaims against Assured and third-party claims against the Estate of Ante Kojic, Marija Kojic and Mirjana Kojic, but these claims were later abandoned due to the insolvency of Assured and the virtual uncollectibility of any judgment against the third-party defendants.[1]
After a bench trial, the trial judge in Middlesex County found in favor of Trico regarding Penn Title's liability under the Trico title policy (count two of the complaint), but left open the issue of damages so that counsel could supply him with written position statements. Ultimately, the judge awarded Trico $115,976.42, with interest from March 23, 1992 according to the rates set forth *349 in R. 4:42-11(a)(ii), plus costs of suit. Final judgment was entered on March 9, 1994.
On appeal, Penn Title argues that (1) the trial court's determination that Trico notified Penn Title in a timely manner was erroneous; (2) the trial court's determination that Trico's late notice of a claim did not prejudice defendant was erroneous; (3) the trial court should have concluded that Trico is the direct and proximate cause of its own damages; and (4) the trial court improperly calculated the damages.

I.
Penn Title claims that the court erred in finding that plaintiff notified Penn Title of its claim in a timely manner. In order for a title insurance company to deny coverage based on late notification of a claim, the title insurance company must prove that it suffered "appreciable harm" due to the late notification. Costagliola v. Lawyers Title Insurance Corp., 234 N.J. Super. 400, 406, 560 A.2d 1285 (Ch.Div. 1988). "Absent `appreciable harm' [a title insurance company] cannot avoid its responsibility." Ibid. (citations omitted). The court went on to hold that defendant title insurance company could show no appreciable harm because the insured's personal attorney accomplished the same goal that the title insurance company would have wanted, a successful outcome. Ibid.
The purpose of notice provisions is to allow the insurer to form an intelligent estimate of its rights and liabilities, to afford it an opportunity for investigation, and to prevent fraud and imposition upon it. Nat'l Newark & Essex Bank v. American Insurance Co., 76 N.J. 64, 82, 385 A.2d 1216 (1978); Associated Metals, etc. Corp. v. Dixon Chemical and Research, Inc., 68 N.J. Super. 305, 318, 172 A.2d 237 (Ch.Div. 1961) modified, 82 N.J. Super. 281, 197 A.2d 569 (App.Div. 1964), certif. denied, 42 N.J. 501, 201 A.2d 580 (1964). Notice provisions are geared toward protecting the insurer's interest, which may be different from the insured's. See Peskin v. Liberty Mutual Insurance Co., 214 N.J. Super. 686, 694, *350 520 A.2d 852 (Law Div. 1986), affirmed in part, remanded in part, 219 N.J. Super. 479, 530 A.2d 822 (App.Div. 1987). In determining if appreciable prejudice exists by failure to give notice, each case must turn on its own facts. Morales v. National Grange Mutual Insurance Co., 176 N.J. Super. 347, 351, 423 A.2d 325 (Law Div. 1980); see also Allstate Insurance Co. v. Grillon, 105 N.J. Super. 254, 260, 251 A.2d 777 (App.Div. 1969).
Had Penn Title received earlier notice of the Eastern/Landmark mortgage and the resulting defect in title, it obviously would have had the opportunity to raise equitable and legal defenses. Penn Title would also have had the responsibility to assume legal representation of Trico pursuant to the terms of the insurance policy. Penn Title argues that it would then have had the opportunity to challenge the priorities of all prior liens, and to set up a good faith defense on the basis of fraud since even the lien dating back to Carteret Savings Bank was created fraudulently so the Chancery Division judge could have marshalled the assets and fashioned an equitable remedy. As it was, Penn Title argues, the claimed late notice to Penn Title after Trico's purchase of the property effectively precluded Penn Title from seeking equitable remedies and mitigating losses.
In 1993, nearly three years after Trico bought the property at the sheriff's sale, Trico applied to the Chancery Division in Bergen County for equitable relief to set aside the sheriff's sale and to reopen the judgment of foreclosure. Judge O'Halloran denied relief on April 20, 1993, holding that between the two innocent mortgagees, the equities favored the other purported mortgagee, Landmark, since Trico at least possessed the property for which it presumably bid fair market value. In addition, Judge O'Halloran clearly indicated that Landmark would be without a remedy because "... the defendant owners will have a fraud defense to Landmark's foreclosure suit." He further held that the application was untimely under R. 4:50-2.
The fallacy with Penn Title's argument is that Penn Title did not suffer any prejudice by being denied the opportunity to attack *351 the validity of Landmark's mortgage at the prior foreclosure proceeding on the basis of fraud since the evidence establishing the forgery of the Landmark mortgage would have established that the Federal/Trico mortgage was also the result of forgery and fraud.
Even had Penn Title been able to present the facts pertaining to the fraud underlying the foreclosure proceedings, the Chancery Division could not have fashioned an equitable remedy. The argument that the court would have allowed the foreclosure to take place and would have marshalled the assets between Landmark and plaintiff is completely unfounded. The court would have been faced with three, not two, innocent parties: Landmark, Trico and Mr. and Mrs. Kojic. Landmark and Trico are sophisticated mortgage companies. Mr. and Mrs. Kojic owned the home that was the subject of the foreclosure action. For some inexplicable reason, they did not contest the foreclosure. If they had, all mortgages would have been declared fraudulent and invalid and neither Landmark nor Trico would be entitled to anything. The court would have returned the property free of all mortgage liens to the Kojics and would have left Landmark and Trico to pursue their respective title insurance companies, or lawyers, for damages.
Thus, even if Penn Title did not learn about plaintiff's claim until two and one-half months after the sheriff's sale, the issue is whether it suffered "appreciable harm." Penn Title did not suffer prejudice by not being allowed to attack the legality of the Landmark mortgage because its mortgage was also forged and thus invalid. Albizu v. Ace Enterprises Co., 163 N.J. Super. 42, 48, 394 A.2d 149 (Ch.Div. 1978). Therefore, it is unnecessary for us to determine if the trial court erred in finding that Penn Title received timely notice of this claim.

II.
Penn Title insured the property, not the credit or financial condition of the mortgagors. Therefore, its claim that it was *352 Trico's negligence that was the direct and proximate cause of the loss is clearly without merit. R. 2:11-3(e)(1)(E). The same is true with reference to Trico's alleged failure to file a notice of settlement and conduct a bring down search. Whether or not Assured or Penn Title was asked to do it, Penn Title through Assured nonetheless issued the title insurance policy.

III.
Lastly, Penn Title argues that the Law Division judge improperly calculated the damages. According to Section 6(a) of the Conditions and Stipulations of the policy, the company shall determine and pay the loss as follows:
(a) The liability of the Company under this policy shall in no case exceed the least of:
(i) the actual loss of the insured claimant; or
(ii) the amount of insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in paragraph 2(a) hereof, or
(iii) the amount of the indebtedness secured by the insured mortgage as determined under paragraph 8 hereof, at the time the loss or damage insured against hereunder occurs, together with interest thereon.
The subject title insurance policy does not contain an "other insurance" clause or any language limiting coverage in the event that there was other insurance also covering the insured's loss. "It is fundamental that in the absence of some contractual provision, each insurer, where several policies are involved, is liable to the insured for the full loss up to the amount of insurance named in the particular policy. That insured is, of course, entitled to but one indemnity, but he may nevertheless look for that indemnity to any one or more of his policies in the absence of any stipulation for pro rating. 26 C.J. 361, § 462." Duncan Building and Loan Assn. v. Glens Falls Insurance Co., 11 N.J. Misc. 791, 792, 168 A. 767 (Sup.Ct. 1933). "[The] strict rule of construction against the insurer is applicable to `other insurance' clauses." Mancuso v. Rothenberg, 67 N.J. Super. 248, 255, 170 A.2d 482 (App.Div. 1961).
Trico was the named beneficiary under the joint credit life insurance policy issued to Ante and Marija Kojic. On April 25, *353 1990, after Ante Kojic died, Trico received $71,133.97 from the proceeds of a life insurance policy on his life. Trico applied this amount first to unpaid interest and then to the reduction of principal on the mortgage. As the trial court found, Trico was justified in applying the life insurance proceeds first to the interest then due and the balance to principal. Paragraph 3 of the FNMA/FHLMC Uniform Instrument (1/80) mortgage provides as follows:
Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.
The judge concluded that the relevant section of the insurance policy pertaining to damages, Paragraph 6(a)(iii), "is in my view quite confusing and ambiguous." We agree. The foregoing paragraph states that Penn Title's liability shall not exceed "the amount of the indebtedness secured by the insured mortgage as determined under paragraph 8 hereof." The Trico mortgage is insured. "Indebtedness" includes both principal and interest. If Penn Title wanted to limit the insured's coverage merely to principal, it should have chosen more precise language in its policy, as the trial judge concluded.
Paragraph 8 of the title policy states that all payments under the policy, except payments made for costs, attorney fees, and expenses, shall reduce the amount of the insurance. Paragraph 8, however, does not apply because there were no payments made "under this policy." Paragraph 8 further states that payment in full by any person or voluntary satisfaction or release of the issued mortgage shall terminate all liability of the company. Obviously, the mortgage was not paid in full, voluntarily satisfied or released. The insurance proceeds did not represent a full payment, therefore, the insurance proceeds could not have satisfied or released the mortgage.
The troublesome issue is the inclusion of 16% interest on the underlying mortgage up to the time when the trial court determined that Trico first suffered a loss under the title insurance *354 policy, which it concluded was March 23, 1992, the date Trico resold the property for less than it bid at the sheriff's sale.[2]
The date of plaintiff's loss should have been set at June 6, 1990, the date of the sheriff's sale, whether or not Trico purchased the property because Trico had no mortgage after that date. A title insurance company's liability cannot be increased because of an insured mortgagee's economic decision to purchase the property at a sheriff's sale.
Trico is entitled to interest at 16% per annum from April 25, 1990 to June 6, 1990. Thereafter, it is entitled to interest in accordance with equitable principles. See Bak-A-Lum Corp. v. Alcoa Building Prod., 69 N.J. 123, 131, 351 A.2d 349 (1976); Manning Engineering, Inc. v. Hudson Cty. Park Comm'n., 71 N.J. 145, 159, 364 A.2d 1 (1976), judgment vacated on other grounds, 74 N.J. 113, 376 A.2d 1194 (1977); Tobin v. Jersey Shore Bank, 189 N.J. Super. 411, 414, 460 A.2d 195 (App.Div. 1983).
We affirm as to liability but reverse and remand to the trial court to assess and recompute interest in accordance with this opinion, i.e., 16% per annum up to June 6, 1990 and at the market rate thereafter.
NOTES
[1] On December 10, 1992, Penn Title filed suit against Assured, Patrick Belardo (its former president), Federal Mortgage and its attorney in the Superior Court, Law Division, Passaic County, under Docket # L-11081-92, seeking damages, attorneys fees and costs arising out of Penn Title's issuance of the title insurance policy and the law suit brought by the plaintiff herein.
[2] Although Trico ultimately resold the premises for $315,000 on March 23, 1992, it is not seeking to recover any loss resulting from its purchase.