82 N.J. Super. 281 (1963)
197 A.2d 569
ASSOCIATED METALS & MINERALS CORP., A NEW YORK CORPORATION, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
DIXON CHEMICAL & RESEARCH, INC., A NEW JERSEY CORPORATION, DEFENDANT AND THIRD-PARTY PLAINTIFF-APPELLANT, AND CROSS-RESPONDENT,
v.
GLENS FALLS INSURANCE COMPANY, A NEW YORK CORPORATION, THIRD-PARTY DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 19, 1962.
Supplemental Memoranda November 20, 29, 1962 and January 10, 1963.
Decided July 24, 1963.
Rehearing Granted September 10, 1963.
Opinion Amended February 19, 1964.
*285 Before Judges GOLDMANN, FREUND and FOLEY.
Mr. Theodore W. Geiser argued the cause for defendant-appellant and cross-respondent and third-party plaintiff-appellant (Messrs. Shaw, Pindar, McElroy, Connell & Foley, attorneys).
Mr. Charles Danzig argued the cause for plaintiff-respondent and cross-appellant (Messrs. Riker, Danzig, Marsh & Scherer, attorneys).
Mr. Samuel A. Larner argued the cause for third-party defendant-respondent (Messrs. Budd, Larner & Kent, attorneys; Mr. Larner and Mr. John J. Budd, of counsel).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Defendant Dixon Chemical & Research Inc. (Dixon) appeals from the whole of a Chancery Division judgment awarding plaintiff Associated Metals and Minerals Corporation (Associated) $300,347.58 in damages, and finding no cause of action as to Dixon's third-party suit against the Glens Falls Insurance Company (Glens Falls) to recover on an insurance policy providing coverage for property damage caused by "accident" in the limited amount of $25,000. Associated Metals and Minerals Corp. v. Dixon Chemical & Research, Inc., 68 N.J. Super. 305 (Ch. Div. *286 1961). The judgment was stayed upon the filing of a supersedeas bond of $325,000. Associated cross-appeals from so much of the judgment as awarded only $300,347.58 and from an order denying its application to have the damages assessed at $500,000.
The trial was an extended one, held before a Chancery Division judge sitting alone.

I.
Plaintiff, a New York corporation, had for many years been an international trader in ores, metal products, steel scrap and steel products. In connection with this business it imported considerable amounts of steel annually from foreign countries and sold it to warehouses, fabricators and consumers. It also exported steel to all parts of the world. However, prior to 1955 it had never engaged in the steel warehouse business, i.e., selling steel at retail from a supply of different types and sizes kept on hand. It is not uncommon for warehouses to store structural steel out-of-doors. Plaintiff began to look for a site to supply the retail market in New Jersey, New York and Connecticut. It checked sites in the Port Newark area and other places in New Jersey, as well as in Brooklyn and Long Island City. It finally selected Port Newark because rail facilities were available, the site was close to the Port Newark Channel where ocean-going vessels could load and unload, and there was room for expansion. Inspection of the site indicated that there were no industrial operations producing smoke within two miles. The area was found free of industrial smells or smoke (plaintiff had rejected the Long Island site for this reason); the Channel had no salty smell, and the Newark Airport, together with the highway complex bordering the site, afforded a protective belt.
On the basis of its experience plaintiff decided that Port Newark was suitable for steel storage. It thereupon entered into a lease with the Port of New York Authority on February 3, 1956 for a plot measuring 285' x 422' (hereinafter *287 Area 1), located a few hundred feet north of Berth 3 of the Port Newark Channel. The first boat deliveries of steel from European sources to plaintiff's site were made early in July 1956. All but 4 1/2 tons of this material was sold prior to the arrival of defendant Dixon's sulphur in September 1956, about to be mentioned. However, plaintiff had before that time already begun negotiations for additional space to the north of and adjacent to Area 1. These negotiations culminated in a lease dated October 5, 1956 between the Port Authority and plaintiff's wholly-owned subsidiary, Associated Metals & Minerals Corporation, a New Jersey corporation, for Area 2, immediately to the north of Area 1; and in a second lease between the same parties dated November 29, 1956, for Area 3, to the north of Area 2. These two leases brought plaintiff's original leased premises to within 113' and 38', respectively, of defendant's sulphur. It appears that plaintiff assigned the Area 1 lease to its subsidiary soon after its execution.
Defendant leased an area 150' x 150' from the Port Authority for a term beginning September 17, 1956 and expiring September 30, 1957, for the "receipt, storage and handling of bulk sulphur" owned by it. At the time it entered into this lease defendant was building a sulphuric acid plant on Doremus Avenue, Newark. Finding it impractical to store sulphur there because of the construction work, it leased the Port Newark plot as a stopgap arrangement. Although the Doremus Avenue plant started operations on November 1, 1956, it was not until early April 1957 that defendant stored sulphur in excess of 1,000 tons at that location. The main storage depot was at Port Newark. When defendant's representatives inspected the site before leasing it, they saw plaintiff's steel stored nearby.
On September 17, 1956 defendant received a shipment of 10,249 gross tons of crude sulphur. The sulphur was removed from the hold of the ship and dumped into a truck which transported it over a road running alongside plaintiff's yard and then deposited it onto defendant's premises. The *288 trucks used were open dump trucks, and as they moved along the road sulphur blew off onto plaintiff's storage yard. As the pile of sulphur grew in size, defendant used a bulldozer to flatten it and make a roadway running up and over the pile so that trucks could go higher to dump their loads. The size of the pile was estimated to be 40' to 50' high. The unloading took place on September 17, 18 and 19, 1956. Sulphur dust covered all of plaintiff's premises and affected the eyes and throats of its employees. It complained to the Port Authority, with the result that Port Manager Fleming, who had seen the dust, told defendant's officials to put covers on the trucks and to wet the sulphur down when loading and unloading. Defendant said it would take care of the situation, but nothing was ever done: no covers were provided for the trucks in moving the sulphur to or from the sulphur pile, nor was the pile or the sulphur on the trucks ever wetted down. The pile was left completely unattended. Newark Inspector of Combustibles and Fire Risks Dukiet also instructed defendant to wet the pile and cover the trucks, but although there were a hose installed and water available, his directions went unheeded.
On April 8, 1957 another sulphur shipment arrived, this one 3,741 gross tons. Defendant deposited 2,519 tons at the rented site and had the remainder trucked to its Doremus Avenue plant. It took two days to unload this shipment. The third and last deposit of sulphur took place on May 28, 1957, when 5,250 gross tons arrived at Port Newark. 725 tons were dumped at the leased site and the remainder trucked to the plant. The operation took two days. As was the case in September 1956, the transporting, dumping and piling of the last two shipments of sulphur was accompanied by dust blown over the entire area, with no effort on defendant's part to contain or diminish the dust by cover or wetting.
From time to time defendant removed sulphur from the Port Newark site for use at its Doremus Avenue sulphuric acid plant. Beginning with October 27, 1956 there were 22 days when such transfers were made. The last of the sulphur *289 was removed on September 23 and 24, 1957, just before defendant's lease expired. A front-end loader would take sulphur from the pile and dump it into open trucks. This created large clouds of dust which blew over the area, including plaintiff's premises. In none of these removal operations was the sulphur wetted or the trucks covered. The testimony was that even in the absence of deposits on or removals from the pile, sulphur dust would blow onto plaintiff's premises whenever there was a strong wind.
Defendant does not dispute that sulphur dust was deposited all over plaintiff's premises. Nor does it dispute that the accumulation of dust on the steel was heavier in Area 3 (only 38' away from the pile) than in Areas 1 and 2, and heavier in Area 2 than in Area 1. There was sulphur dust on all the steel in every part of the yard  as much as 1/8" thick at the northern end nearest the pile.
There was no rust on plaintiff's steel prior to the arrival of the sulphur. Rust began to appear toward the end of October 1956. This was not ordinary surface rust, which is brownish in color, provides a protective coat which adheres to the surface of the steel, and is not laminated or flaky. The rust which appeared on the steel after the sulphur arrived was yellowish-brown and flaky. It was testified that by March 1957 the steel was heavily flaked and pitted; even the steel in Area 1 was pitted. A photograph taken June 12, 1957 shows scale more than 1/32" thick and the steel severely pitted. Some of the scale was as large as the palm of a hand. On that day six representative samples of rust were taken from steel in different parts of the yard and analyzed. Steel which arrived at plaintiff's yard in January 1957 showed a sulphur content of 0.53% or higher, and steel which arrived in the two preceding months showed 0.32%, 0.54% and 1.10%. The chlorine content ran between 0.03% and 0.05%. These figures become significant in the light of the testimony of plaintiff's experts, hereinafter mentioned.
On December 1, 1959, sometime after the sulphur pile had been removed, six specimens of prime structural steel cut *290 from an angle iron were placed on the roof of the scale house on plaintiff's premises at Port Newark, and three specimens were placed about eight miles from the railroad station in Stamford, Connecticut, in what is described as a semi-rural area. The angle iron used was newly purchased and still had mill scale on it. (Mill scale was described by defendant's expert as an iron oxide which automatically forms on steel because of the high temperature rolling process it is put through at the mill.) Analysis six months later showed that the sulphur in the samples exposed at Port Newark was .10%, while the Stamford samples showed .09%  almost the same. The difference between these figures and the sulphur content found in the rusted steel at Port Newark while the sulphur pile was present is patent and significant. Plaintiff's expert Weisberg said this test demonstrated that the Port Newark environment compared very closely with that of the rural atmosphere in Stamford. Chlorine analysis of the nine specimens showed that the amount found in those exposed at Port Newark was identical with that found in the Connecticut samples. It was also testified that steel can be stored outdoors from one to two years without protection; the light discoloration of ordinary surface rust would not affect the classification of the steel as new steel.
Plaintiff bought tarpaulins in October 1956, and more in December, to protect its steel from the sulphur dust, spending $1,802.20 for this purpose. Toward the end of October or in early November it began to look for a protective oil which would retard or prevent corrosion by the sulphur, and after some experimentation finally decided that Oakite protective oil was best for the purpose. A heavier oil or a thick coating of grease might have been more effective in retarding corrosion, but would have rendered the steel unmerchantable. Plaintiff's expert Tour said that if heavier protective oil were used, "Nobody would take that structural steel out on a job if you ever greased it up with that stuff. It would be a hazard." This statement went uncontradicted. The decision to use the Oakite product was made in December 1956, *291 at which time all the structural steel was sprayed with oil. As new structural steel arrived it was sprayed immediately. All the steel was sprayed from time to time to obtain maximum protection. Plaintiff spent $2,418.29 for the protective oil, which figure does not include the cost of labor or the spraying equipment used.
Plaintiff received shipments of structural steel from European mills (where it purchased all the steel here in question) after the arrival of the first sulphur, but 90% of this steel had been purchased before plaintiff knew that sulphur would be deposited in the vicinity. It decided to stop purchasing steel for its Port Newark operation in December 1956 because of the sulphur. However, it could not stop shipments on steel it was already committed to buy; it could not cancel out. The final shipment was received in April 1957.
Although the last of defendant's sulphur was not removed until late September 1957, plaintiff had to abandon its plans for conducting a warehouse business at the Port Newark site because, as was testified, no customer would buy new steel from a warehouse which also sells damaged steel; the reputation of the warehouse would be ruined if both were sold, and it would become known as a damaged steel warehouse.
Plaintiff sold its prime steel by phone or by letter at warehouse prices until the sulphur damage made its appearance. Some of the damaged steel sold after that time was returned, and plaintiff had to give rebates or pay the customer's freight. In the light of this experience plaintiff, in March or April of 1947, instructed its entire sales force to sell the steel subject to inspection, as quickly as possible and at the best price obtainable. The testimony was that the only other way of selling the damaged steel was at scrap prices, and this would have yielded substantially less than plaintiff's procedure of selling subject to inspection.
The sulphur dust resulting from defendant's unloading operation in September 1956, as already mentioned, irritated the eyes and throats of plaintiff's employees, covered its storage area, and even penetrated the interior of its scale *292 house. Plaintiff complained of the conditions, then and subsequently, and, as noted, Port Manager Fleming as well as Newark Inspector Dukiet told defendant's officials to cover the trucks and wet down the sulphur. The instructions went unheeded. At the end of January 1957 Fleming notified defendant's director of operations in charge of the sulphur pile, one Skeuse, that the sulphur dust was damaging plaintiff's steel. This came about because of plaintiff's specific complaint. As a result, Skeuse met with plaintiff's Mr. Norton and they made a tour of inspection. Skeuse offered to "hose the steel down." This information was at once conveyed by phone to Dr. Schweitzer, plaintiff's metallurgist, who told Skeuse that he did not believe that the washing down of the steel would remedy the situation; it "would only be a temporary solution," since the sulphur dust was always coming over onto plaintiff's premises.
Plaintiff finally instituted this action in the Chancery Division on July 1, 1957. The complaint was in two counts. The first described the sulphur dust condition and alleged that defendant's acts constituted a nuisance which defendant refused to abate despite plaintiff's demands, and if permitted to continue would result in great and continuing damage to plaintiff's property and to its employees. The second count charged negligence because of defendant's failure to use such means as were reasonably necessary to contain and confine the sulphur and sulphur powder on the trucks or on its own premises, with the result that plaintiff's steel was greatly depreciated through corrosion caused or accelerated by the sulphur. Plaintiff demanded judgment restraining defendant from creating or maintaining any unprotected sulphur mound on its leased premises or permitting sulphur dust to be blown about and deposited on plaintiff's property, and from otherwise continuing the nuisance complained of. It also demanded $500,000 in damages.
Defendant, by its answer and amended answer, of which more hereafter, denied the charges and set up these separate defenses: (1) it had violated no legal duty owing to plaintiff; *293 (2) plaintiff was guilty of contributory negligence; (3) plaintiff's subsidiary, the New Jersey corporation, was guilty of negligence which proximately caused or contributed to the damage plaintiff claims it sustained, which negligence was imputable to plaintiff under N.J.S.A. 46:36-1; (4) plaintiff, in selecting the particular premises, voluntarily assumed the risk of a known danger; (5) the damage was not proximately caused by defendant; (6) defendant made reasonable use of its own property and, finally, (7) plaintiff was not entitled to equitable relief.
Defendant, pursuant to leave granted by the Chancery Division, filed a third-party complaint against Glens Falls Insurance Company under the policy it had issued, seeking judgment for such sums as might be found due from defendant to plaintiff, as well as the expenses, costs and reasonable attorneys' fees incurred by it in defending the action. The trial, which consumed more than a month, resulted in the $300,347.58 judgment against defendant and a finding of no cause of action in defendant's third-party suit. This appeal and cross-appeal followed.

II.
Defendant claims it was denied its right to a trial by jury, either in the Chancery Division or by transfer of the cause to the Law Division, and this in violation of our 1947 Constitution, Art. I, par. 9, and R.R. 4:39-1. Although this is the last of the eight points it argues on appeal from plaintiff's judgment, we dispose of it first. A review of the proceedings is necessary for a proper understanding of the issue.
Plaintiff's July 1957 complaint, based on nuisance as well as negligence, sought injunctive relief against defendant's sulphur operations and also damages for injury to the steel. Defendant made no demand for a jury trial in its answer or within ten days of its filing, as required by R.R. 4:39-1. It may immediately be observed that failure of a party to serve a demand as required by that rule constitutes *294 a waiver of jury trial. R.R. 4:39-3. Defendant applied for, and on November 1, 1957 was granted, leave to file a third-party complaint against Glens Falls Insurance Company. Glens Falls answered, but it, too, made no demand for a jury trial. Defendant had in the meantime removed the last of its sulphur pile, but plaintiff had no information or notice that it intended to discontinue its sulphur-piling practice permanently.
Pursuant to notice dated June 3, 1958, plaintiff applied for an order permitting it to amend its complaint in several respects, among them by increasing its damage claim to $1,000,000. It also moved for leave to file a supplemental complaint to cover that amount. Defendant opposed both applications. The matter was continued until the first pretrial conference on September 19, 1958 before Chancery Division Judge Kolovsky, on which occasion defendant for the first time orally applied for a jury trial and a transfer of the cause to the Law Division. Judge Kolovsky reserved decision and subsequently handed down an opinion reported in 52 N.J. Super. 143 (1958). Plaintiff's applications, he said, involved the exercise of sound judicial discretion, to be exercised in the light of the factual situation existing at the time they were made. If, as was admitted, no facts then existed authorizing injunctive relief, it would not be a proper exercise of discretion to permit either the filing of a supplemental complaint containing allegations of threatened future injuries and a prayer for injunctive relief, or an amendment to the complaint restating the threat of future injury and continuing the prayer for injunctive relief. He observed that:
"For plaintiff to proceed on its original complaint even though injunctive relief has become moot is one thing, but if plaintiff desires leave to file an amendment to the original complaint and a supplemental complaint, any leave granted should be conditioned upon the elimination of allegations which are contrary to the conceded facts, viz., threatened future injury, as well as deletion of the prayers for equitable relief. * * *" (52 N.J. Super., at page 151)
Accordingly, he concluded that unless plaintiff accepted these conditions, leave to file the amended and supplemental complaints *295 would be denied. On the other hand, if it assented, leave would be granted and defendant would then be entitled to demand a jury trial.
Plaintiff did not accept the conditions, with the result that an order was entered December 2, 1958 denying its applications to file an amended complaint and a supplemental complaint, and denying defendant's motions to transfer the action to the Law Division and for a jury trial. Defendant then applied to this court for leave to appeal. One of the arguments it advanced was that the trial would be an extended one involving considerable expense, and therefore the right to a jury trial should be settled before trial. We denied leave to appeal on January 6, 1959.
More than 1 1/2 years after plaintiff had instituted this action, defendant launched upon a determined campaign to obtain a jury trial. On February 27, 1959 it applied for leave to file a third-party complaint against plaintiff's wholly-owned subsidiary, the New Jersey corporation. The proposed complaint was endorsed with a demand for a jury trial on all issues. Chancery Division Judge Sullivan heard the motion, concluded that the proposed complaint gave no indication of the substance of the alleged cause of action, and entered an order denying leave, without prejudice. On June 19, 1959 defendant again applied for leave to file a third-party complaint against the subsidiary, this time on the basis of depositions taken since denial of its first application. The proposed complaint bore an endorsement demanding a jury trial. The motion was continued until the pretrial by an order signed by Chancery Division Judge Pindar.
The pretrial conference took place October 20, 1959. Judge Pindar, over defendant's objection, denied its application for leave to file the third-party complaint, and so provided in the pretrial order subsequently entered. Defendant having asked for leave to file an amended answer, the order granted leave to file in accordance with the form submitted at the pretrial conference. It is important to consider just what the amended answer alleged. Examination demonstrates that it set forth *296 in substance, albeit not in the same language, the defenses raised by the original answer filed in August 1957. Only one new item appears  the demand for a jury trial.
In the course of the pretrial conference defendant argued that on the basis of the facts then existing, plaintiff should abandon the issues of equitable relief, all claims for such relief having become moot. (The reference, of course, was to the discontinuance of the sulphur pile at the end of September 1956.) Plaintiff declined to do so, whereupon Judge Pindar adjudicated, and later so provided in the pretrial order, that "The issue of equitable relief is involuntarily abandoned without prejudice."
The order had not been completed at the pretrial conference because the judge took under advisement defendant's application for a jury trial. By letter opinion of November 5, 1959 Judge Pindar concluded that defendant was not entitled to a trial by jury despite its contention that the granting of leave to amend its answer extended the time to demand a jury trial. In his view, the action taken by Judge Kolovsky barred defendant's application. Accordingly, Judge Pindar, in the paragraph of the pretrial order dealing with the order of opening and closing to a jury, stated: "Inapplicable on Court determination of right thereto, to which defendant objects and reserves the right to be heard on Motion."
Pursuant to this reservation defendant moved for an order transferring the action to the Law Division for trial by jury or, in the alternative, for a jury trial in the Chancery Division, on the ground that the issues defined by the pretrial order did not involve any claim for equitable relief and were triable of right by a jury upon compliance with R.R. 4:39-1, with which rule defendant claimed it had complied in its amended answer. Judge Pindar denied the application by letter opinion dated January 5, 1960, and entered an accordant order.
Defendant at once applied to this court for leave to appeal that order, and in its supporting brief advanced the same argument it now makes on full appeal. It stressed the fact *297 that the situation had changed since Judge Kolovsky's determination, because the pretrial order had determined that the equitable issues were involuntarily abandoned. Defendant, as it does now, argued its constitutional right to a jury trial, and that the pretrial order superseded the pleadings, under R.R. 4:29-1. It also called attention to the fact that the pretrial order had assigned four weeks for the trial, that the trial would be an extended and expensive one, and therefore the question of the right to trial by jury should be determined beforehand. We denied leave to appeal by order dated February 10, 1960. Thereafter defendant moved for leave to appeal to the Supreme Court. That court denied the application on March 14, 1960. If these rulings mean anything, they signify that neither court considered the ground of appeal substantial. See R.R. 2:2-3(a), which applies to this court; Romano v. Maglio, 41 N.J. Super. 561, 567-568 (App. Div. 1956).
Defendant concedes that so long as plaintiff was entitled to proceed on the allegations of the original complaint, the primary claim was for equitable relief  the claim for damages was incidental. It maintains, however, that the issue of equitable relief did not survive the pretrial; however much plaintiff may have continued to insist that it was not abandoned, Judge Pindar determined that since there was no basis for it, it would be treated as "involuntarily abandoned." The pretrial order, it is said, is inconsistent with the original complaint, and therefore superseded it under R.R. 4:29-1.
Unquestionably, there was no right to trial by jury under the 1844 New Jersey Constitution where the sole relief sought was a Chancery injunction. It is also clear that the 1947 Constitution did not enlarge this right, but merely precluded its attrition by either the Legislature or the courts. Steiner v. Stein, 2 N.J. 367, 379 (1949). Where an issue was triable without a jury prior to 1947, it remained so triable under the 1947 Constitution.
It is a settled rule that where equity has rightfully assumed jurisdiction over a cause for any purpose, it may ordinarily retain the cause for all purposes and proceed to a final *298 determination of the entire controversy, including the establishment of purely legal rights and the granting of legal remedies. Mantell v. International Plastic Harmonica Corp., 141 N.J. Eq. 379, 393 (E. & A. 1947), modifying 138 N.J. Eq. 562 (Ch. 1946). In that case, an injunction proceeding, injunctive relief became inappropriate pendente lite, and equity awarded damages for breach of contract. Our highest court said:
"Ordinarily, the jurisdiction of equity is tested by the facts existing at the inception of the suit; and if the complainant is then entitled to equitable relief, equity's jurisdiction to settle all the issues, even though purely legal in nature, and to award damages for the breach of a legal right involved in the suit, will not be defeated by subsequent events which render equitable relief impracticable or unnecessary or unsuitable. [Citations omitted] This must necessarily be so, for the rationale of the rule that an equitable feature draws the cause completely within the cognizance of equity is the policy of avoiding `a multiplicity of suits.' Pomeroy's Equity Jurisprudence (5th ed.), §§ 181, 243. * * *" (141 N.J. Eq., at page 393)
Mantell, a case which arose before the adoption of our 1947 Constitution, was quoted with approval in Steiner v. Stein, above, where Chief Justice Vanderbilt said that
"* * * as under the old practice, once the jurisdiction of equity has attached `it may retain the cause for all purposes, and proceed to a final determination of the entire controversy and, except where the jurisdiction of equity depends on the prior establishment of a right at law, settle purely legal rights and grant legal remedies,' Fleischer v. James Drug Stores, Inc., 1 N.J. 138, 150 (1948). Accordingly, where an action is brought which in the first instance is cognizable in the Chancery Division, it should be retained in that division irrespective of the fact that before or during the trial the equitable phases of the cause have been fully disposed of, leaving only purely legal issues remaining for determination, Mantell v. International Plastic Harmonica Corp., 141 N.J. Eq. 379 (E. & A. 1947)." (2 N.J., at page 378)
Justice Heher, speaking for the court in Fleischer v. James Drug Stores, Inc., 1 N.J. 138, 150 (1948), noted that the constitutional right of trial by jury is subject to the inherent jurisdiction of equity, which has general jurisdiction to adjudicate ancillary and incidental matters and may, in the *299 exercise of a sound discretion, do whatever is necessary to a final adjudication of the entire controversy between the parties, whether it encompasses an action ex delicto or ex contractu. As to the issue here raised, see also Morris May Realty Corp. v. Monmouth Board of Freeholders, 33 N.J. Super. 93 (Ch. Div. 1954), modified on other grounds, 18 N.J. 269 (1955); Garrou v. Teaneck Tryon Co., 11 N.J. 294, 300-301 (1953); and, generally, Schnitzer and Wildstein, New Jersey Rules Service, A IV-1260-1263, 1272-1273.
R.R. 4:39-1, which requires that a party demand a jury trial of any issue triable of right by a jury by serving a written demand upon the other parties not later than ten days after service of the last pleading directed to such issue, is directly based on the identical Federal Rule of Civil Procedure 38. The federal cases indicate that the assertion of the right to a trial by jury in an amended pleading, filed after the expiration of the ten-day period, does not constitute compliance with the requirement for proper and timely demand. See, generally, 5 Moore, Federal Practice (2d ed. 1951), §§ 38.39 and 38.41, pp. 312 et seq. and 325 et seq., where Moore states that when the ten-day period of Federal Rule 38(b) has run, "an amendment of a pleading which does not introduce new issues will not give rise to the right to demand a jury." § 38.39[2], p. 318. We have already observed that our analysis of the amended answer reveals that it set out no new issues which were not joined after service of the original answer. See Schnitzer and Wildstein, op. cit., A IV-1291-1292.
We therefore hold that defendant was not entitled to a trial by jury in the circumstances of this case, either constitutionally or under R.R. 4:39-1.

III.
Although defendant's first point deals with proximate cause and its second with the question of legal duty, we deal with these issues in the reverse and more logical order.
*300 Defendant insists that it violated no legal duty owing plaintiff. To support its position it discusses at some length the rules stated in sections 826 to 828 of the Restatement of Torts (4 Restatement, p. 241 et seq. (1939)), and urges that they be applied in its favor.
In entering judgment for plaintiff, Judge Pindar, applying the law to the facts, found defendant liable because it had wrongfully maintained a nuisance which proximately caused the damage to plaintiff's steel. He further found that plaintiff's conduct did not amount to contributory negligence or assumption of risk so as to bar recovery, either in fact or in law.
It is significant that nowhere in its brief does defendant argue that the trial judge's findings were not supported by credible evidence, or that they were against the weight of the evidence. Where questions posed for review are principally factual in nature, the trial court's conclusion as to them will not lightly be disturbed unless they are so unsupported by the evidence as to offend the interests of justice. Hopler v. Morris Hills Regional District, 45 N.J. Super. 409, 415 (App. Div. 1957); Spagnuolo v. Bonnet, 16 N.J. 546, 555 (1954). Particularly is this so where, as here, the significant proofs came from experts. "The measure of faith and trust to be reposed in the testimony of expert witnesses is preeminently the concern of the trier of the facts." New Jersey Highway Authority v. J. & F. Holding Co., 40 N.J. Super. 309, 316 (App. Div. 1956). The trial judge was entirely correct in assessing plaintiff's proofs as establishing its case by a preponderance of the evidence.
Our courts have clearly recognized that where a defendant's conduct gives rise to a continual invasion of adjoining property by reason of airborne dust, fumes, odors, etc., such conduct is tortious within the concept of absolute nuisance, and this without regard to standards of due care, negligence, and the like. The invasion itself constitutes an actionable wrong. See Hartman v. Brigantine, 23 N.J. 530, 534-535 (1957), affirming 42 N.J. Super. 247 (App. Div. *301 1956), an action for wrongful death based upon defendant municipality's negligent acts of commission. In the course of that opinion Justice Jacobs discussed the law of nuisance and referred to and approved Justice Cardozo's classic decision, McFarlane v. City of Niagara Falls, 247 N.Y. 340, 160 N.E. 391, 57 A.L.R. 1 (Ct. App. 1928). Justice Cardozo had stressed that nuisance as a concept in law has variable meanings. Thus, said Justice Jacobs, nuisance "is applied to circumstances where the defendant acts at his peril, and issues of negligence and contributory negligence have little or no bearing  `one who emits noxious fumes or gases day by day in the running of his factory may be liable to his neighbor though he has taken all available precautions,'" quoting from McFarlane. And see Krauth v. Geller, 54 N.J. Super. 442, 452 (App. Div. 1959), an opinion by Judge (now Justice) Hall, affirmed 31 N.J. 270 (1960). As plaintiff observes, this is precisely the type of tortious conduct of which it complains, aggravated by the fact that defendant took no measures to eliminate or reduce the continuous invasion of plaintiff's premises and steel by its sulphur. This invasion cannot be deemed negligent or accidental, but must be considered willful and reckless. Indeed, defendant in its brief, after conceding that the sulphur dust did invade plaintiff's premises, states that it "does not dispute the characterization of its conduct as `intentional' within the meaning of [the Restatement] rules." That conduct unquestionably amounted to an absolute or "true" nuisance, a nuisance per se.
The Restatement of Torts does not employ the term "nuisance" because of the loose use of that term by some courts, with resultant uncertainty of meaning. Rather, chapter 40, p. 214 et seq., is captioned "Invasions of Interests in the Private Use of Land (Private Nuisance)," and the rules stated "are expressed in terms of the interests invaded, and the conduct involved in the invasion." See 4 Restatement, at pages 215-216. The invasion may be intentional or unintentional: "A person is subject to liability for an intentional invasion *302 when his conduct is unreasonable under the circumstances of the particular case, and for an unintentional invasion when his conduct is negligent, reckless or ultrahazardous." Ibid., p. 222.
Section 822 of the Restatement, p. 226, states the general rule of liability for interference with the use of land as follows:
"The actor is liable in an action for damages for a non-trespassory invasion of another's interest in the private use and enjoyment of land if,
(a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and
(b) the invasion is substantial; and
(c) the actor's conduct is a legal cause of the invasion; and
(d) the invasion is either
(i) intentional and unreasonable; or
(ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct."
Although defendant, as just noted, concedes that its conduct was "intentional" for the purpose of applying the Restatement tests, it seeks comfort in the comment to section 826, p. 241 (comment (a)) that the mere fact that an invasion is intentional does not mean that it is unreasonable. However, the comment goes on to say that "There are, of course, certain types of intentional invasions which are so uniformly regarded as unreasonable, both in legal and popular opinion, that courts and legislatures have declared them to be so as a matter of law." See also comment (d) on page 243. For examples of such judicial declarations in our own State, see Hinmon v. Somers Brick Co., 75 N.J.L. 869 (E. & A. 1908) (noxious fumes); Wallace & Tiernan Co., Inc. v. United States Cutlery Co., 97 N.J. Eq. 408 (Ch. 1925) (vibrations); Melacci v. Eagan, 124 N.J. Eq. 241 (E. & A. 1938) (noise, fumes, odors); Benton v. Kernan, 127 N.J. Eq. 434 (Ch. 1940), modified 130 N.J. Eq. 193 (E. & A. 1941) (vibrations, noise, smells, blasted rock particles); Kosich v. Poultrymen's *303 Service Corp., 136 N.J. Eq. 571 (Ch. 1945) (dust, grain residue, odors, noise, vibrations).
The proofs in this case clearly demonstrate that the movement of the sulphur and the maintenance of the pile brought defendant well within the quoted Restatement rule so as to establish liability for plaintiff's damage. One need go no further than section 822 to reach this conclusion, but since defendant has emphasized the provisions of sections 826 through 828 and asks that we apply them, brief reference to the Restatement text is in order.
Section 826, p. 241, states that "An intentional invasion of another's interest in the use and enjoyment of land is unreasonable under the rules stated in § 822, unless the utility of the actor's conduct outweighs the gravity of the harm." This balancing factor has been recognized in Sans v. Ramsey Golf & Country Club, Inc., 29 N.J. 438, 449 (1959), affirming 50 N.J. Super. 127 (App. Div. 1958). Comment (c) to the Restatement rule, p. 242, explains that the gravity or seriousness of the harm must be considered from the objective, legal standpoint, and so with the utility or meritoriousness of the conduct.
Section 827 requires that the following factors be considered in determining the gravity of the harm: the extent of the harm, its character, the social value which the law attaches to the type of use or enjoyment invaded, the suitability of the particular use or enjoyment invaded to the character of the locality, and the burden on the person harmed of avoiding the harm. These factors are not foreign to the decisions of our courts, but have been employed in various factual settings, if not in the precise words of the rule, then in equivalent language.
The Restatement emphasizes that the extent of the harm depends not only upon the degree of interference with the use or enjoyment of the land, but also upon its duration. Comment (b), p. 245. The proofs establish that the sulphur dust was all over plaintiff's premises and damaged more than 16 million pounds of structural steel. The dust invasion continued *304 over a whole year and was obviously of a serious nature. The test as to the character of the harm is whether the invasion causes physical damage or personal discomfort. Comment (c), p. 246. Both were present here. As for the "social value" test, comment (e), p. 247, states that "Uses of land for residential, agricultural, business, industrial, recreational or other beneficial purposes have a general or extrinsic social value. They are essential to the functioning of organized society, and substantial interferences with them under almost any circumstances are relatively serious." Plaintiff's business use of the areas it had leased obviously had such a social value  as much so as defendant's use of its land. Turning to the fourth of the section 827 tests, we hold, contrary to defendant's contention, that plaintiff's particular use was appropriate to the character of the locality. Steel storage was within the local zoning laws; it was an inoffensive use and entirely appropriate because of the ocean, rail and trucking facilities in the area. Finally, with respect to plaintiff's burden of avoiding the harm, there was its expenditure on tarpaulins and protective oil and its cutting off of further purchases of steel from European mills before the end of 1956, only a few months after the appearance of the sulphur pile. By way of contrast, there was no effort at all on defendant's part to cover its trucks, wet down the sulphur pile or use any reasonable method of confining the sulphur.
Defendant relies upon the "utility of conduct" tests laid down by section 828 of the Restatement, page 250. The factors considered important are the social value which the law attaches to the primary purpose of the practice, the suitability of the conduct to the character of the locality, and the impracticability of preventing or avoiding the invasion. It cannot be said that defendant's use of its leased areas did not have a social value, as defined in comment (e) to section 827, above. And see comments (d) and (e) to section 828, pp. 252-253. The piling of the sulphur, at least with respect to the first and largest shipment in September 1956, was made necessary because of the unavailability of defendant's Doremus *305 Avenue property. We cannot agree with plaintiff when it asserts that there was no social value because defendant intentionally permitted the sulphur dust to permeate the area, thus making its conduct illegal. This is an entirely separate and different consideration. As for the suitability of defendant's conduct to the character of the locality, it cannot be said that the sulphur piling and removal alone were unsuitable; it was the manner in which defendant conducted these operations which exposes it to liability. Finally, and with reference to the third of the "utility of conduct" tests, dealing with the impracticality of preventing or avoiding the invasion, there can be no question that defendant could have done a number of things to prevent the spread of sulphur dust. Some of these have already been mentioned. It has made no attempt to show that the taking of preventive measures would have been prohibitive or constituted a hardship.
We conclude that whether one consider the matter in the light of the decisional law of this State or by adoption and application of the Restatement of Torts rules, defendant owed plaintiff a legal duty which the proofs definitely establish defendant breached.

IV.
[The court considers defendant's claim that its conduct was not the proximate cause of plaintiff's damage, and concludes that the record fully supports the trial judge's finding that the sulphur dust was the direct, active cause of the steel corrosion.]

V.
Defendant next argues that its conduct is immunized by plaintiff's contributory negligence, under the doctrine of Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44 (1959). In that case Chief Justice Weintraub traced the historical evolution of the concept of assumption of risk and concluded that in its primary historical sense the term meant that defendant *306 was free of negligence, but in its secondary sense it meant no more than contributory negligence.
The doctrine of contributory negligence does not help defendant, for we are here concerned with an absolute nuisance, not negligence. Even if one were to assume that plaintiff was contributorily negligent, that would be no defense to the action. 2 Harper and James, Law of Torts, § 22.8, p. 1219 et seq. (1956); compare Prosser on Torts (2d ed. 1955), § 74, p. 423 et seq. And see Hartman v. Brigantine, above, 23 N.J., at page 535; Krauth v. Geller, above, 54 N.J. Super., at page 453.
Nor is defendant's conduct immunized by any doctrine of assumption or risk, i.e., "moving closer to the nuisance." Defendant in its brief admits that "moving to a nuisance" is not in itself regarded as a defense in "true" nuisance cases. That this is the general rule cannot be questioned. 1 Harper and James, op. cit., § 1.28, p. 83, and 22.8, p. 1220, where the authors observed that "moving to a nuisance" is not a defense, for "If such conduct on plaintiff's part deprive him of his remedy, that fact would virtually allow defendant, by his wrongful conduct, to condemn part of the value of neighboring land without compensation." This was the holding in Benton v. Kernan, above, 127 N.J. Eq., at pages 466-467, which stated the settled law to be that "no right of prescription can be acquired to maintain a nuisance."
Defendant further suggests that its conduct is immunized by the concept of "avoidable consequences." This argument should more properly be addressed to the question of diminution of damages; it does not go to the existence of a cause of action. See 4 Restatement, Torts, § 918, p. 601, and comment (a), pp. 601-603. But that aside, we cannot say that plaintiff was blindly heedless of defendant's conduct, or intentionally failed to protect its steel. It complained, used tarpaulins, sprayed protective oil, stopped the flow of steel to its site. As to the latter, it must be recalled that 90% of the steel had been purchased prior to the arrival of the sulphur in September 1956. Of course, plaintiff was under no obligation *307 to assume that defendant's conduct would continue. Cf. Hinmon v. Somers Brick Co., above, 74 N.J.L., at page 872. Were this a negligence case (and it is not) even the rule that a plaintiff must attempt to mitigate damages does not require extraordinary or impractical efforts to do so. Reasonable diligence and ordinary care are all that is required of him. 15 Am. Jur., Damages, § 28, p. 424 (1938). We see no merit in the "avoidable consequences" argument.

VI.
Defendant claims error because the trial court, over its objection, admitted into evidence the summaries of plaintiff's books of account, Exhibits P-42 and P-43. The court used them in computing damages. Defendant points out that these summaries were prepared for use at the trial and not in the regular course of business, by one Steinberg, an employee of plaintiff, and were simply his recapitulations and computations based upon entries in plaintiff's regular books of account. These were never placed in evidence, although they were marked for identification as P-39, P-40 and P-41. Again, the entries in the books of account were not made by Steinberg or under his supervision, but by a Mrs. Grayson, the head bookkeeper, who was not produced as a witness. Defendant further asserts there was no testimony as to how the books were prepared, or that the entries had been made contemporaneously with the transactions they supposedly represented, or concerning the sources of information. Thus, the books were not admissible as business records under N.J.S. 2A:82-35, and this being so, the summaries were inadmissible. This argument omits several significant matters in the record.
Defendant does not mention that plaintiff had invited it to examine its books of account and financial records a year or more before trial began, and this without a court order permitting inspection. At no time prior to trial did defendant take up the offer; instead, three days before trial it served plaintiff with a notice to produce its financial records, including *308 the books of account. (This was followed by a subpoena duces tecum after the trial had started.) When the trial opened, plaintiff declared itself still willing to have defendant examine its financial records. The fact remains that at no time during the more than one month of trial did defendant attempt to examine any of the financial records plaintiff produced in response to the subpoena, except for a few sales invoices, or to use them on cross-examination. Plaintiff also offered to have defendant examine all of the records, including the contracts, covering the purchase of steel from the European mills, so long as the names of the suppliers were kept secret. Again, this offer was never acted upon.
Steinberg was in plaintiff's bookkeeping department during the years in question, 1956 to the time of trial. He was familiar with the books of account and how they were kept. Exhibits P-39 and P-40 for identification, two large ledgers each measuring some 4" thick and consisting of entries relating not only to the steel in question but other steel, were in court throughout the trial. They covered transactions for the years 1956 and 1957, respectively, and were maintained in the regular course of business.
Plaintiff changed to the National Cash Register machine accounting system in 1958. These records consisted of sheets identified by Steinberg as kept in the regular course of business and on which were recorded transactions involving the steel in suit along with other transactions. The sheets, marked P-41 for identification, were in court during the trial and covered the year 1958. As for the books of account for the years 1959 and 1960, they were in use in plaintiff's business at the time of the trial, but defendant waived their physical production and agreed to examine them in plaintiff's New York office. It never did. As in the case of the other records, Steinberg identified the 1959 and 1960 sheets as kept in the regular course of business.
It had taken Steinberg two months to prepare Exhibit P-42 and two weeks to prepare Exhibit P-43. P-42 summarized the entries in the books of account for the steel here involved, *309 for the period September 17, 1956 to the end of 1958. All the items in P-42 came from the books except the computations of the totals and the cost per hundred pounds of steel, which Steinberg himself made from the underlying basic data. He estimated that P-42 involved some 3,000 entries. P-43, a continuation of P-42, covered the years 1959 and 1960, and were prepared in the same way.
Present in the court room during the trial were the invoices covering plaintiff's sales of the steel involved in this action, admitted in evidence as Exhibits P-52A and B. They showed the dates of sale, quantities sold, sales prices and names of the purchasers, and had been available to defendant for inspection as early as the forepart of 1958. Defendant did not examine them, either before or during trial. Additionally, Exhibits P-9 and 10, consisting of the yard books, were in evidence at the time P-42 and P-43 were admitted. They showed the dates of delivery of the various lots of steel, the sizes and weights, and the names of the steamers. It should also be noted, incidentally, that Exhibits P-42 and P-43 were identical with Exhibits A and B attached to the answers to interrogatories served on defendant on September 28, 1960, so that it had all the information summarized in the challenged exhibits a month prior to their admission in evidence.
The rule we here adopt is stated in 4 Wigmore on Evidence (3d ed. 1940), § 1230, p. 434:
"Where a fact could be ascertained only by the inspection of a large number of documents made up of very numerous detailed statements [italics the author's]  as, the net balance resulting from a year's vouchers of a treasurer or a year's accounts in a bank-ledger  it is obvious that it would often be practically out of the question to apply the present principle by requiring the production of the entire mass of documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered, in the shape of the testimony of a competent witness who has perused the entire mass and will state summarily the net result. Such a practice is well established to be proper.
"Most Courts require, as a condition, that the mass thus summarily testified to shall, if the occasion seems to require it, be placed at hand in court, or at least be made accessible to the opposing party, *310 in order that the correctness of the evidence may be tested by inspection if desired, or that the material for cross-examination may be available." (Italics ours)
The rule is one of convenience, based upon practical necessity. We hold that in the circumstances P-42 and P-43 were properly admitted in evidence as an exception to the best evidence rule. Defendant was not prejudiced because it had had an opportunity to inspect the original records either for the purpose of verifying the summaries or for cross-examination. The books were available for a year before the trial and were in court. Cf. Linnell v. London & Lancashire Indemnity Co., 74 N.D. 386, 22 N.W.2d 203, 206 (Sup. Ct. 1946), and the cases there cited; Pallma v. Fox, 182 F.2d 895 (2 Cir. 1950).

VII.
[The court finds no error in the striking of defendant's interrogatories seeking the names and addresses of the manufacturers and sellers of the foreign steel; that Exhibits P-42 and P-43 supplemented a schedule attached to an earlier set of answers to interrogatories; and that it was no abuse of discretion to deny defendant's motion, made in the middle of an extended trial for a continuance of a week or two to permit examination of plaintiff's financial records.]

VIII.
[Defendant's claims of error as to certain rulings on matters of evidence, held non-prejudicial.]

IX.
Plaintiff's cross-appeal challenging the correctness of the award made for the damage it suffered may appropriately be considered at this point. Plaintiff deals with the matter at some length in its brief, but we have not had the benefit of defendant's thinking by way of reply brief.
*311 In dealing with the issue of damages, the trial judge said:
"* * * Generally the measure of damages for the loss or destruction of personal property in cases of this type, being a situation in the stream of commerce, is the difference between its market value, if it has a market value, immediately before and immediately after the injury. In order for it to be said that a thing has a market value, it is necessary that there shall be a market for such commodity  that is, a demand therefor and an ability from such demand to sell the same when a sale thereof is desired. Where, therefore, there is no demand for a thing and no ability to sell the same, then it cannot be said to have a market value and the recovery in such case is generally the difference between its actual value as of the time and place immediately before its destruction and the value received upon securing sale, or if not sold the salvage value after the damaged condition. * * *" (68 N.J. Super., at page 314)
He concluded that plaintiff had not sustained its burden of establishing that "there was such a demand for the steel at the time of the occurring injuries to effectuate a sale of the entire supply of the steel in the yard, nor in fact did the plaintiff show that a substantial portion of this steel was demanded." (Italics ours) Accordingly, one could not consider the fair market value of the steel in its prime condition, but must deal with the actual values involved.
To arrive at the total damages plaintiff sustained, the trial judge reviewed Exhibits P-42 and P-43. He found the value of the steel to be the price paid for the steel in Europe plus the transportation charges from Europe to Port Newark. He then determined the total amount realized from the sale of damaged steel and arrived at a figure of $300,347.58. Finding that the storage charges plaintiff had had to pay did not "enhance the value of the steel," he did not include this item in calculating damages.
We do not consider the amount awarded as fairly compensating plaintiff for the damage it suffered.
The total amount of structural steel received at plaintiff's yard from July 4, 1956 to April 26, 1957 was 26,497,811 pounds. As we have said, plaintiff contracted for 90% of this steel prior to the arrival of defendant's sulphur in September *312 1956, and then stopped buying in December 1956 because of the corrosive effect of the sulphur dust. It sold 9,606,230 pounds of steel in undamaged condition or before the sulphur had done much damage. There remained 16,891,581 pounds of damaged steel. We have earlier indicated that sales of this steel resulted in complaints and returns by customers, so that plaintiff in March or April 1957 had to adopt the policy of sales by inspection. It was testified plaintiff could not sell new steel from its Port Newark yard because of the reputation the damaged steel had given its business operation. The record establishes the existence of a market at warehouse prices for steel arriving in February, March and April of 1957, but "at that time the yard had already such a bad name that people didn't want to buy the material." In fact, plaintiff had to abandon its warehouse operation once all the steel on order had arrived at Port Newark.
Plaintiff had the choice of selling its damaged steel at scrap prices or to try for the best prices it could get for the steel as it was. It chose to do the latter, instructing its salesmen to get rid of the steel as quickly and at the best price possible. It took three years, but plaintiff realized $873,869.68 for the damaged steel. As scrap it would have brought less than half the sum. During this three-year period plaintiff had to pay monthly storage charges of 50¢ to $1 a ton, depending on the type of material. This was the going rate in the business.
We cannot agree with the trial judge that plaintiff had to show that there was such a demand for its steel at the time of the sulphur damage that it could have sold its "entire supply," or a "substantial portion" of its steel. The steel warehouse business is based on supplying customers with their needs for one or another type of steel as such needs arise from time to time. Warehousemen do not sell all their steel at one time. Customers do not suddenly descend upon a warehouse so as to take up its entire stock, and warehousemen naturally would be expected to try to keep some stock on hand at all times to satisfy customers. This aside, the trial judge overlooked the fact that plaintiff could not have sold new structural steel at *313 all because of the reputation its operation had gotten because of damaged steel. The sulphur corrosion put a period to its steel sales  the damage done, there were no customers to demand any of the supply, let alone the entire supply or a substantial portion thereof.
The record establishes that there was a market for structural steel at warehouse prices at the time of corrosion damage and thereafter. This was evidenced by the exhibit Iron Age, the weekly publication of the steel trade and considered the "bible of the steel industry," in the words of plaintiff's expert Krasnov, who had been in the steel business for 21 years both as buyer and seller. The issues of Iron Age in evidence covered the period from September 13, 1956 to September 1960 and recorded the warehouse prices for structural steel during that period. There was also admitted into evidence the "size extra" lists showing the price that had to be added to the basic price of structural steel (as published in Iron Age) for the particular shape or size involved. Iron Age and the lists were, of course, properly admitted in evidence. McCormick on Damages, § 46, p. 177 (1935); 6 Wigmore on Evidence (3d ed. 1940), § 1704, p. 26; State v. Carrano, 27 N.J. Super. 382, 389 (App. Div. 1953). Steinberg, who prepared Exhibits P-42 and P-43, used Iron Age and the "size extra" lists, in addition to plaintiff's financial records, in computing the market value of the undamaged steel. It might incidentally be noted that Krasnov testified there was no price differential in warehouse prices for foreign or domestic steel in the years 1956 through 1960.
As stated above, plaintiff had been able to sell 9,606,230 pounds of steel in the eight or nine months preceding the time when it had to change its sales policy by selling the now corroded steel subject to inspection. Plaintiff alleges that it would have disposed of a like or greater quantity of undamaged steel in the eight or nine months following the inauguration of this policy in March or April 1957  and, one must logically interpolate, the remainder after that. It cannot be said that this was too sanguine a hope. The market for steel *314 was brisk down to the middle of 1957, when there was some falling off in demand. But demand there was, then and thereafter. Prices remained fairly stable because, as Krasnov said, when demand falls off, prices in America are not cut  production is.
The trial judge therefore fell into error in failing to recognize the existence of an on-going market, with steel prices definitely established during the entire period in question, 1956 through 1960. He also failed to consider the fact that plaintiff had successfully moved over 4,800 tons of steel before the sulphur damage put it out of the new steel business, and that had it not been for this damage it could have continued operating as theretofore.
It has been said that if the evidence affords a basis for establishing the damages with some reasonable degree of certainty, it is sufficient. Tessmar v. Grosner, 23 N.J. 193, 203 (1957). There was a solid foundation for establishing plaintiff's damages: the court not only had proof of the various types and sizes of undamaged steel and their cost and transportation charges, but also the weekly market prices that existed for such steel. Plaintiff was therefore entitled to recover the difference between the market value of its steel before and after the injury caused by Dixon's sulphur pile. See Wolcott, Johnson & Co. v. Mount, 36 N.J.L. 262 (Sup. Ct. 1873), affirmed 38 N.J.L. 496 (E. & A. 1875); Howell v. Lehigh Valley R.R. Co., 94 N.J.L. 213 (E. & A. 1920); Kazanjian v. Atlas Novelty Co., Inc., 34 N.J. Super. 362 (App. Div. 1955), where the existence of an established market price was apparently of such significance that no question was raised as to the ability of the market to absorb the quantity of the particular material involved.
R.R. 1:5-4(a), made applicable to this court by R.R. 2:5, provides that we may exercise such original jurisdiction as may be necessary for the complete determination of any cause on review. This specifically includes the making of new or amended findings of fact in non-jury cases. R.R. 1:5-4(b).
We are not hampered here by the properly recognized *315 advantage of the trial judge to determine the credibility of witnesses, gained from their presence in the proceeding. We have before us precisely the same records as were presented to the trial court  specifically Exhibits P-42 and P-43 (the same as Schedules A and B annexed to the answers to the second set of interrogatories), and Exhibit P-53. From these exhibits we find that the market price of the steel in an undamaged condition at the time it had to be sold in a damaged condition amounts to $1,533,777.96. The proceeds of sale realized through plaintiff's special effort in selling the damaged steel subject to inspection  rather than as scrap  amounted to $873,869.68. The difference between these two figures is $659,908.28. This sum is in excess of the $500,000 to which plaintiff limited its recovery. (Its complaint was filed and the case tried before the change in our rules eliminating a specific ad damnum clause. R.R. 4:8-1.) It does not, of course, include the items of special damage which plaintiff is also entitled to recover, namely, the cost of the tarpaulins and Oakite oil it had to buy, as well as the cost of equipment and labor in spraying the steel in an attempt to protect it from the sulphur.
Even were we to disregard such increases in the market price of structural steel as occurred after January 23, 1957, and compute plaintiff's loss by taking the lowest market price at which said steel was selling between August 1956 and the end of 1960  i.e., the prices in effect between August 1956 and January 23, 1957, as evidenced by Iron Age and the "size extra" lists  the market value of the steel damaged by Dixon's sulphur was $1,461,289.34. Deducting the proceeds realized from the sale of the damaged steel ($873,869.68) from the market price of the steel in an undamaged condition ($1,461,289.34), plaintiff's loss would be $587,419.66. Again, this is more than the $500,000 to which plaintiff limited its recovery, without taking into account the items of special damage just mentioned.
Since plaintiff cannot recover more than the $500,000 which it demanded, calculation of the other items of special *316 damage (tarpaulins, Oakite oil, etc.) would in no way improve its position or affect the amount it may be entitled to collect from Dixon. Remand for the determination of these items of special damage would be a futility and only result in delay.
In the exercise of our original jurisdiction we therefore mold the judgment in plaintiff's favor so that the amount of damages to be recovered by it is $500,000, the full amount it claimed and a figure actually short of the damages it would otherwise be entitled to recover. Cf. our determination in Giumarra v. Harrington Heights, 33 N.J. Super. 178, 197 (1954), affirmed o.b., 18 N.J. 548 (1955).

X.
We deal now with defendant's appeal from the no cause of action judgment entered in favor of third-party defendant Glens Falls. The trial judge found that defendant had failed to give timely notice to the company, as required by the insurance policy.
There is no need to set out the terms of the policy in full; they may be found in the trial court's opinion, 68 N.J. Super., at pages 316-317. Suffice to say that defendant was obliged to give the company written notice "as soon as practicable" upon the occurrence of an "accident." It case of claim made or suit brought, the insured was to forward every demand, notice, summons or other process to the company immediately. The policy made compliance with its terms a condition precedent to any action against the company.
We hold, as did the trial judge, that defendant failed to give the required notice of accident to the company "as soon as practicable." This term has been construed to mean "within a reasonable time," and what is a reasonable time is for the fact-finder. Miller v. Zurich General Acc. & Liab. Ins. Co., 36 N.J. Super. 288, 294, 296 (App. Div. 1955).
Defendant is a chemical company and knew or should have known the effect that sulphur dust could have upon human *317 beings and metal products. It had complaints about the dust almost immediately after it piled its sulphur in Port Newark in September 1956. The port manager and the Newark inspector made concrete suggestions for confining or reducing the dust, but these were ignored. There were complaints about the dust thereafter. Defendant's employees could readily have observed the deposit of sulphur on plaintiff's adjacent yard  the dust accumulation and the corrosion condition were open to full view. However, defendant said nothing to its insurance company.
But more important than this is the fact that defendant knew of the damage to plaintiff's steel on February 1, 1957 when its Mr. Skeuse participated in a tour of inspection of plaintiff's yard. If no other date is critical, this one is. No reasonable man could have failed to anticipate that some claim might be made for the damage to the steel, and yet defendant failed to notify its insurer. It was only after the complaint was filed and served in July 1957, some 5 1/2 months after the specific complaint of steel damage, that Glens Falls first had notice of any claim when it received the suit papers defendant had forwarded to it. The record is bare of any attempt by defendant to excuse or explain this delay. The delay is fatal to its claim under the policy. Weller v. Atlantic Casualty Ins. Co., 128 N.J.L. 414, 416 (Sup. Ct. 1942) (94 days an unreasonable delay); Bankers Indemnity Ins. Co. v. A.E.A. Co., 32 N.J. Super. 471, 478 (App. Div. 1954) (delays of 127 days on one claim and 94 days on another found unreasonable); Miller v. Zurich General Accident & Liability Ins. Co., above, 36 N.J. Super., at page 296 (delay of about three weeks held too long in the absence of extenuating circumstances).
Defendant would equate "notice of accident" with "notice of claim," arguing that the absence of a definite claim by plaintiff before July 1957 excused its failure to give notice. If, as defendant asserts, the factual setting hereinbefore described spelled out an "accident," then it was under a double obligation: it had to give "notice of accident" under paragraph *318 9 of the policy, and "notice of claim" (if any) under paragraph 10. The two notices are separate and distinct. Each is a condition precedent. The absence of a claim does not excuse notice of the accident. The company was entitled to the latter "as soon as practicable" (i.e., with reasonable promptness) so that it might investigate and thus prepare and protect itself should a claim be made. Not every accident results in a claim, and yet insurers expect prompt notice from insureds so as to enable them to investigate without too much delay. Such investigation may discourage a claim or result in settlement at a nominal or reasonable figure. We therefore find defendant's attempt to equate the two notices to be without substance.
This determination makes unnecessary any discussion of Glens Falls' further contention that the damage suffered by plaintiff was not "caused by accident" and therefore not within the policy coverage.

XI.
In conclusion, we find that defendant's liability for plaintiff's damage was correctly decided, as was the trial court's finding of no cause of action in defendant's third-party suit against the insurance company. However, that part of the judgment relating to damages must be vacated and judgment in the amount of $500,000 entered in plaintiff's favor.
The judgment, as so modified, is affirmed.